Geraldine CALHOUN, Appellant,

v.

Darrell CALHOUN, Appellee.

Supreme Court of Kentucky.

Jan. 14, 1977.

Paul Fauri, Larry Sword, Appalachian Research and Defense Fund of Kentucky, Inc., Prestonsburg, Kay Adrian, Metropolitan Legal Aid of Denver, Denver, Colo., for appellant.

Joe Hobson, Burnis Martin, Prestonsburg, for appellee.

PALMORE, Justice.

Geraldine Calhoun appeals from that portion of a divorce judgment which awards custody of her two infant children, Angelia and Johnny, to their father, Darrell Calhoun, subject to weekly visitation by and with the mother. It is another of those domestic controversies that would vex even the great Solomon.

Geraldine and Darrell are now about 29 years of age. They were married in 1966 and finally separated in 1974. Angelia was born on August 9, 1967, and Johnny on February 10, 1969. Geraldine lives with her parents, and Darrell and the children live with his parents, all in the neighborhood of Water Gap in Floyd County. Geraldine has had intermittent hospitalization for mental illness and at the present time is not gainfully employed. Except for the bounty of her parents, her only sustenance disclosed by the record is $20 every other week which the judgment requires Darrell to pay for her maintenance. Darrell has a regular job with the state highway department during the day and works nights and Saturdays for a local florist. According to Geraldine, he

grosses about $470 per month, whereas Darrell says his "take-home" pay is $340 to $350 per month. Out of this he makes car payments of $90 per month and payments of $20 per month on a long-standing hospital bill.

Geraldine's father is a retired coal miner who is disabled and unable to work. Her mother is employed by a shoe company in Prestonsburg. They live on a dirt road at the head of a hollow. We have no description of their household, but they have near their home a vacant three-room house that would be available to Geraldine if she were to regain custody of the children. However, it does not have running water and would have to be improved before it could be comfortably occupied. According to Darrell's testimony, there are other children in the home of Geraldine's parents.

For most of their lives the infant children have resided in or near the home of Darrell's parents. For some of this time Geraldine and Darrell lived with the Calhouns, and at the time of their last separation they were living just across the creek in a house trailer which had been given to them by the Calhouns. The elder Calhoun is a retired coal miner drawing a U.M.W. pension and preaching at three churches without compensation. It seems to be conceded that the Calhouns are better off than the Whitts, which Geraldine contends is the reason the trial court gave custody of the children to Darrell. The main thrust of her case is that poverty is not a valid basis for depriving a mother, who is otherwise fit, of the custody of her children. With that we agree, but it is not all that simple.

Geraldine's illness is of a schizophrenic nature and has existed from high-school days. On three different occasions she has been hospitalized for extended periods of time, once for nine months. Nevertheless, her doctor, a psychiatrist employed by Eastern State Hospital, says that with the medication she is taking there is no reason why she cannot care for the children in a proper and adequate manner, that she needs them and they need the mother's "touch." She is, incidentally, preparing to go to a vocational school so that she may assume a gainful occupation. She is described by the witnesses in general as a good girl, neat, clean, highly intelligent, and a good mother.

Geraldine's counsel argue that in effect the custody of the children has been granted to the paternal grandparents as opposed to the mother, and that such a disposition is unauthorized without a finding, or evidence to support a finding, that the mother is unfit. They cite our recent statement in *Chandler v. Chandler*, Ky., 535 S.W.2d 71, 72 (1975), that in order for a parent to be deprived of the custody of a child in favor of a nonparent, "not only must it be shown that the child's welfare will be better served under the custody of the nonparent, but also it must be found that the parent is not a suitable custodian." We do not agree, however, that merely because the parental custodian is living with and keeping a child in the home of his own parents, and will be away most of the time by reason of his work, the grandparents perforce are the custodians. The selection of whom he will leave the child with, at what times, and for how long, is an incident of his own custodial function and discretion. What they do with and toward the child is subject to his dominion—his veto, as it were. That he may, for example, send the child to a boarding school does not make the school the custodian; it is simply his agent.

We are inclined to think also that if Geraldine had custody of the children Darrell could make the same argument. In the first place, the only way in which it was suggested that she could live separately from her own parents is that Darrell be required to put up the money to make the three-room house habitable and then contribute at least $250 per month for maintenance and child support. Geraldine estimated that the initial cost would be about $200. It is common knowledge that the installation of a bathroom alone would cost more than that. Then there is the fact that Geraldine expects to find employment, which would result in the children's being left in the care of some one or more of the members of her family during non-school

hours while she is away at work. In summary, we simply cannot resolve this case on the basis of its being a custody contest between a parent on the one hand and grandparents on the other. One set or the other of the grandparents is going to occupy a major role in the lives of the children whichever way it goes.

We have gone to such length in discussing this problem for the reason that the trial court made no findings of fact on the point. It is a great temptation, when a trial court decides a matter without giving a reason, to infer that there really was not any good reason, and to reverse the decision summarily. But CR 52.04 bids us otherwise.

■ All other things being equal, as between the parents it is recognized, not as a rule of law but as a fact, that children of tender years usually are better off with the mother. See discussion in *Casale v. Casale,* Ky., 549 S.W.2d 805 (decided today). In this instance, however, all else is not equal, or at least not nearly enough equal to justify holding the trial court's determination to be clearly erroneous. Quite aside from her mental instability, which is not without some degree of significance, it is clear that Geraldine's only source of financial means to provide and maintain a home for herself and the children would be whatever can be squeezed from Darrell, and his income is not enough to stand it. Her own prospects of supplementing that source of revenue are, at present, speculative and remote. It seems inevitable that she and the children would wind up in the home of her parents and their other children. Their life would be a constant battle in the court house to force Darrell to provide funds, transportation and medical treatment for the children (both of whom have serious physical problems) that he now provides voluntarily. Unquestionably, the home in which the children have spent most of their lives, and the one they know best, is the home of their father's parents. If the father were dead the scales might weigh differently, but the fact that he makes his home with his parents cannot diminish his right to have the custody if under all circumstances that is what reasonably appears best for the children.

■ In summary, while it is true that the courts must in every case accord great weight to the fact that small children need a mother more than they need a father during their tender years, and is equally true that the mother's poverty alone ought not be allowed to deprive them of it, still "the overriding issue is what is for the best interest of the child." *Eviston v. Eviston,* Ky., 507 S.W.2d 153 (1974). Though every effort must be made to exclude or offset the element of economic disadvantage, it cannot be completely ignored if the ultimate objective really is the welfare of the child. Regrettably, it is a fact of life and there is no honest way to deny its relevance.

*West v. West,* 294 Ky. 301, 171 S.W.2d 453 (1953), cited in Geraldine's behalf, is in many respects comparable with this case. Rarely, however, are two domestic relations cases on all fours. In weighing up the welfare of a child there are factors on both sides of the scales, and these various factors do not weigh the same from case to case, or even from time to time in the same case. In *West,* for example, there was a "clearly proven unfitness" on the part of the father. 171 S.W.2d at p. 456. It is not so in this instance, and that alone is enough to distinguish the cases.

As pointed out in *Eviston v. Eviston,* Ky., 507 S.W.2d 153 (1974), the custody of these children is subject to review and change as provided in KRS 403.340. If and when Geraldine, with such additional financial support as Darrell can reasonably be required to contribute, is better able to maintain them in a separate home of her own, and if there be no deterioration in her mental condition, she will have a strong case for either a transfer of custody or a more equitable division of custody as between her and the father.

■ We have considered the evidence in this record very carefully and with real compassion for the mother, but we cannot

in good conscience hold that it contains no reasonable basis for the judgment of the trial court.

The judgment is affirmed.

All concur.