Rosemarie R. SQUIRES, Appellant,

v.

Paul W. SQUIRES, Appellee.

No. 92–SC–289–DG.

Supreme Court of Kentucky.

April 22, 1993.

Rehearing Denied July 1, 1993.

Phyllis K. Lonneman, Elizabethtown, for appellant.

David T. Wilson II, Donald Skeeters, Radcliff, for appellee.

LAMBERT, Justice.

This Court granted discretionary review to address the proper construction and application of KRS 403.270(4).[1] With its 1980 enactment of the foregoing statute, the General Assembly expressly declared the right of trial courts to grant joint custody to the parents of a child with the only standard being "best interest." Heretofore this Court has not provided any guidance to trial courts in exercise of their broad discretion. As the appropriate use of joint custody is the subject of considerable debate and there appears to be little uniformity among the trial courts of Kentucky in its application, we took review of this case as it contains the elements of the classic dilemma.

1. For convenient review, KRS 403.270 is here reproduced in its entirety.

"403.270. Custody—Best interests of child shall determine—Joint custody permitted.—
(1) The court shall determine custody in accordance with the best interests of the child and equal consideration shall be given to each parent. The court shall consider all relevant factors including:

(a) The wishes of the child's parent or parents as to his custody;

(b) The wishes of the child as to his custodian;

(c) The interaction and interrelationship of the child with his parent or parents, his siblings, and any other person who may significantly affect the child's best interests;

(d) The child's adjustment to his home, school, and community;

(e) The mental and physical health of all individuals involved; and

(f) Information, records, and evidence of domestic violence as defined in KRS 403.270.

(2) The court shall not consider conduct of a proposed custodian that does not affect his relationship to the child. If domestic violence and abuse is alleged, the court shall determine the extent to which the domestic violence and abuse has affected the child and the child's relationship to both parents.

(3) The abandonment of the family residence by a custodial party shall not be considered where said party was physically harmed or was seriously threatened with physical harm by his or her spouse, when such harm or threat of harm was causally related to the abandonment.

(4) The court may grant joint custody to the child's parents if it is in the best interest of the child. (Enact. Acts 1972, ch. 182, § 17; 1978, ch. 86, § 1, effective June 17, 1978; 1978, ch. 369, § 1, effective June 17, 1978; 1980, ch. 158, § 1, effective July 15, 1980; 1992, ch. 169, § 2, effective July 14, 1992.)"

Of the parties' four-month marital cohabitation was born a son. Upon commencement of proceedings to dissolve the marriage and the appearance of a dispute over child custody, *inter alia*, the case was assigned to the Domestic Relations Commissioner who heard extensive testimony and rendered proposed findings of fact and conclusions of law. The Commissioner found that both parties would be good parents who would place the interest of their child first. This, he believed, made them likely candidates for joint custody. However, he also found that the parties were not sufficiently cooperative to accommodate joint custody and recommended that it not be granted. On exceptions to the Commissioner's report, the trial court acknowledged the hostility between the parties, but concluded that this alone did not prevent an award of joint custody. The court emphasized that the parties were "good parents" and in reliance on its "policy" to grant joint custody and the statutory standard of the child's best interest, determined that the benefits of joint custody outweighed the detriments. The court also recognized the availability of subsequent custody litigation when joint custody has been granted, and the extreme difficulty of such litigation when sole custody has been granted. Upon the foregoing, judgment was entered granting the parties joint custody.

A divided panel of the Court of Appeals affirmed the trial court. The majority emphasized the positive aspects of joint custody such as shared decision-making, parental involvement in child rearing and encouragement of parental cooperation. It also noted the availability of subsequent litigation if joint custody proved to be unworkable. The dissenting opinion expressed the view that prior to an award of joint custody, the court must be satisfied that the parties possess sufficient maturity to suppress their enmity toward one another and avoid having their personal animosity destabilize the upbringing of the child.

Appellant contends that "overwhelming evidence of discord and lack of cooperation between the parties" renders the judgment awarding joint custody clearly erroneous when measured against the best interest standard. For this contention she relies upon various scholarly articles and decisions from other jurisdictions which appear to support the view that without substantial parental cooperation, joint custody is undesirable.[2] She concludes that "joint custody demands ideal circumstances and exceptional parents to succeed at all. Even with highly committed and motivated parents, joint custody is not for all children." Appellant asks this Court to set standards for trial courts for the exercise of their discretion with respect to joint custody and, in effect, suggests that in the absence of an agreement by the parties, joint custody should not be awarded, and even then, the trial court should be satisfied that the agreement was not procured improperly and that it is appropriate in the circumstances.

Appellee relies upon the statute and points to the absence of any statutory requirement that the parties agree upon joint custody. He relies upon the trial court's broad discretion and observes that if cooperation is declared a prerequisite for joint custody, any party may defeat it by a bad faith refusal to cooperate. He suggests the proper standard is whether the trial court believes from the evidence there is a reasonable likelihood of future cooperation which will redound to the child's best interest.

From the foregoing facts and arguments, the issue which emerges is whether parties who are found to be good parents who will endeavor to place the interest of their child uppermost should be denied joint

2. *See* M. Sun, "1988 Review of Family Law," Clearing House Review, p. 944 (January 1989); I.W. Lowe, "Evaluating Parental Potential in Joint Custody," 69 Mich.B.J., pp. 140–3 (Fall 1990); Dianne Post, "Arguments Against Joint Custody," 4 Berkeley Women's Law Journal, p. 316 (1989, 90). *See also Blake v. Blake,* 106 A.D.2d 916, 483 N.Y.S.2d 879 (1984); *Salamone v. Salamone,* 83 A.D.2d 778, 443 N.Y.S.2d 464 (1981); *Braiman v. Braiman,* 44 N.Y.2d 584, 407 N.Y.S.2d 449, 378 N.E.2d 1019 (1978); *In Re Adams,* 133 Ill.2d 437, 141 Ill.Dec. 448, 551 N.E.2d 635 (1990); and *In Re Marriage of Lester,* 791 P.2d 1244 (Colo.Ct.App.1990).

custody due to their hostility and refusal to cooperate with one another.

■ At the outset, we must consult the statute. A cursory examination of KRS 403.270 manifests the overriding consideration that any custody determination be in the best interest of the child. It is equally clear that neither parent is the preferred custodian and the parents' wishes, while appropriate for consideration, are not binding on the trial court. While the focus of this case is on joint custody as authorized in section (4) of KRS 403.270, the decision to grant or deny joint custody cannot be determined without reference to the entire Act. As such, the broad array of factors contained in the Act must be considered appropriately prior to a determination of joint custody or sole custody.

We begin with the assumption that it would be in a child's best interest to be reared by two parents who are married to each other. See KRS 405.020. With the occurrence of divorce, however, such a circumstance is not possible and trial courts are faced with the task of formulating a custody arrangement which will as nearly as possible replicate the ideal and minimize disruption of the life of the child. As such, and prior to any particularized assessment of the parents and child, joint custody would appear to be the best available solution. In theory, the child would continue to be reared by both parents and have the benefit of shared decision-making with respect to important matters, with neither parent being designated as the primary custodian and the other relegated to a secondary status. Clearly, it was this ideal which motivated the General Assembly to declare that trial courts may grant joint custody, but place it within the context of the entire custody statute, KRS 403.270, and limit it by the best interest test.

It is now widely recognized that in many cases, embittered former spouses are unwilling to put aside their animosity and cooperate toward their child's best interest. Often joint custody merely prolongs familial conflict and provides vindictive parties with a convenient weapon to use against one another. Of course, the same is true of a custody and visitation arrangement. As such, some contend that it is better to have a clean break between spouses and award one or the other sole custody to bring about the child's most rapid adjustment to post-divorce circumstances. While the logic of this position is not unappealing, if it were fully applied, the role of the noncustodial parent would be diminished to a point of insignificance.

■ Even if this Court were so inclined, it is not our prerogative to eradicate the concept of joint custody from the law of Kentucky. The General Assembly has determined that it is viable and it is our duty to apply the statutory framework in a manner which gives effect to legislative intent. *H.O. Hurley Co. v. Martin,* 267 Ky. 182, 101 S.W.2d 657 (1937). From the language used, we believe the General Assembly intended to inform courts of their option to award joint custody in a proper case without mandating its use in any case. Implicit in the authorization to award joint custody is that the court do so after becoming reasonably satisfied that for the child the positive aspects outweigh those which are negative. We see no significant difference between the analysis required with respect to joint custody than the analysis required when the court grants sole custody. In either case, the court must consider all relevant factors and formulate a result which is in the best interest of the child whose custody is at issue. Legislative authorization of joint custody merely gives the trial court another alternative if such appears to be appropriate.

■ The parties have debated the significance of parental agreement and willingness to cooperate at the time of the custody determination. While we have no doubt of the greater likelihood of successful joint custody when a cooperative spirit prevails, we do not regard it as a condition precedent. To so hold would permit a party who opposes joint custody to dictate the result by his or her own belligerence and would invite contemptuous conduct. Moreover, the underlying circumstance, the parties' divorce, is attended by conflict in virtually every case. To require goodwill between

the parties prior to an award of joint custody would have the effect of virtually writing it out of the law.

■ By what standard then should a trial court determine whether joint custody should be granted? Initially, the court must consider those factors set forth in KRS 403.270(1). By application of these, the child whose custody is being litigated is individualized and his or her unique circumstances accounted for. In many cases, appropriate consideration of KRS 403.270(1) may reveal the result which would be in the child's best interest. Thereafter, we believe a trial court should look beyond the present and assess the likelihood of future cooperation between the parents. It would be shortsighted to conclude that because parties are antagonistic at the time of their divorce, such antagonism will continue indefinitely. Emotional maturity would appear to be a dependable guide in predicting future behavior. By cooperation we mean willingness to rationally participate in decisions affecting the upbringing of the child. It should not be overlooked that to achieve such cooperation, the trial court may assist the parties by means of its contempt power and its power to modify custody in the event of a bad faith refusal of cooperation. *Benassi v. Havens*, Ky.App., 710 S.W.2d 867 (1986); *Erdman v. Clements*, Ky.App., 780 S.W.2d 635 (1989).

■ A leading joint custody decision in this jurisdiction is *Hardin v. Hardin*, Ky. App., 711 S.W.2d 863 (1986), a case in which the custody dispute arose upon dissolution of a marriage of long duration, when the children were twelve and ten years of age, and the mother had moved a substantial distance from the home of the father. Reversing the trial court's award of joint custody and equal division of the children's time between the parents, the Court of Appeals appears to have assumed that because the parties were not then cooperating, they could not cooperate. The Court also appears to have been influenced by the distance the parents lived from one another and the disruption occasioned by changing the children's school every six months. While the Court in *Hardin* considered the

proper factors, it depended too much on the parties' present failure to cooperate and, in effect, permitted one or both of them to deprive the trial court of a custody option granted it by the General Assembly. The most recent joint custody decision in this jurisdiction is *Chalupa v. Chalupa*, Ky. App., 830 S.W.2d 391 (1992), in which the Court of Appeals reversed the trial court's award of sole custody to the mother. Despite its finding that both parties were "responsible," the trial court nevertheless deprived the father of joint custody due to his frequent absence from home necessitated by his employment. The *Chalupa* decision made a number of points worthy of repetition here. First, it noted that even when joint custody is awarded, the court may designate where the child shall usually reside, and we declare that the court may make such other orders as are necessary to properly effectuate joint custody. *Chalupa* also recognized that joint custody envisions shared decision-making and extensive parental involvement in the child's upbringing, and in general serves the child's best interest. Finally, the Court recognized that joint custody may have the effect of encouraging parents to cooperate and stay on their best behavior.

"Joint custody can be modified if a party is acting in bad faith or is uncooperative. The trial court at any time can review joint custody and if a party is being unreasonable, modify the custody to sole custody in favor of the reasonable parent. Surely, with the stakes so high, there would be more cooperation which leads to the child's best interest, the parents' best interest, fewer court appearances and judicial economy." *Id.* at 393.

While we stop short of endorsing the *Chalupa* preference for joint custody, i.e. "consider joint custody first," we endorse many of the views expressed therein. An examination of the majority and dissenting opinions in *Chalupa*, which, incidentally, was by the same Court of Appeals panel which decided this case, well illustrates the opposing philosophical views of the issue at hand. In final analysis, however, whatever one's philosophy may be with respect to

joint custody, so long as KRS 403.270(4) remains the law of Kentucky, joint custody must be accorded the same dignity as sole custody and trial courts must determine which form would serve the best interest of the child.

■ Perhaps no decision which confronts circuit courts is more difficult than a contested child custody case. In such cases, the court is called upon to decide who shall have what the parties often perceive as their most precious "possession." With the enactment of KRS 403.270(4), this burden was enhanced, but the duty of the court remains the same. Just as it is impermissible to prefer one parent over the other based on gender, it is now impermissible to prefer sole custody over joint custody. In every case the parties are entitled to an individualized determination of whether joint custody or sole custody serves the child's best interest. That the court possesses broad discretion in this regard cannot be gainsaid. *McNamee v. McNamee*, Ky., 432 S.W.2d 816 (1968).

In the case at bar, the Court of Appeals recognized that the trial court's use of the term "policy" as justification for the award of joint custody was merely a means of expressing the view that these were good parents who would put the interest of their child first, and would, in time, achieve an acceptable level of cooperation. While this Court is uncomfortable with the application of a "policy" as such implies insufficient analysis under the statute, our review of the orders and judgment of the trial court reveals no failure of painstaking consideration of the case. Moreover, both courts below were well aware of the availability of subsequent litigation in the event the parties remain obstinate.

■ Prior to concluding it is necessary to address appellant's contention that the trial court denied her due process of law when it rejected the sole custody recommendation of the Domestic Relations Commissioner without first reviewing the videotape of the hearing. Initially, we discover nothing in appellant's brief which discloses the basis for her contention that the trial judge did not review the evidence. Our rule is clear that in presenting a summary of the facts and procedural events, a party shall provide

> "ample references to the specific pages of the record, or tape and digital counter number in the case of untranscribed tape-recordings, supporting each of the statements narrated in the summary." CR 76.12(4)(c)(iii).

Moreover, we have not been informed by what means this question was preserved for appellate review as required by CR 76.12(4)(c)(iv). While these omissions would be sufficient to defeat any review, inasmuch as appellee has not disputed the truth of appellant's assertion, and the Court of Appeals accepted the contention as true, we will address the merits.

After rendition of the Commissioner's report, exceptions were heard by the trial court. The parties were given an ample opportunity to present their contentions orally and in writing, and in response to this, the trial court rendered a thorough set of findings of fact, conclusions of law and decree. Subsequently, on appellant's motion, the final judgment was extensively amended.

Our examination of the trial court's findings of fact reveals no departure from the facts as found by the Commissioner on the issue here. Their views departed only on the legal conclusion to be drawn therefrom, i.e. whether joint custody was appropriate in the circumstances. This case differs substantially from *Lynch v. Lynch*, Ky. App., 737 S.W.2d 184 (1987), in which the trial court prepared its findings of fact, conclusions of law and order prior to conclusion of the evidence. The central holding in *Lynch* was that "due process requires, at the minimum, that each party be given a meaningful opportunity to be heard." *Id.* at 186. This case more nearly resembles *Haley v. Haley*, Ky.App., 573 S.W.2d 354 (1978), which held that CR 53.-06(2) "allows the trial judge complete discretion as to the use of a commissioner's report." *Id.* at 356. The Court also said:

> "Although the trial judge modified the commissioner's order, he did not alter the attached findings of fact. It therefore

appears that the court intended to adopt those findings." *Id.* at 356.

Based upon these authorities, we discover no error in the trial court's handling of the case at the exceptions phase.

We affirm.

STEPHENS, C.J., and COMBS, REYNOLDS, SPAIN and WINTERSHEIMER, JJ., concur.

LEIBSON, J., dissents by separate opinion.

LEIBSON, Justice, dissenting.

Respectfully, I dissent.

The decision in this case will profoundly affect the future of countless children. The subject is how to interpret and apply KRS 403.270(4), which states:

"The court may grant joint custody to the child's parents if it is in the best interest of the child."

Under this statute, including subsection (4), the "best interest of the child" is not just another thing to be considered along with the sensibilities of the parents in awarding custody. It is not just the most important thing. It is the only thing.

The Majority Opinion states:

"In such cases, the court is called upon to decide who shall have what the parties often perceive as their most precious 'possession.'"

Children are "precious" but not as their parents' "possession," and parents must not treat them as such. Social science data amassed since the advent of the joint custody experiment some 20 plus years ago studying the effects of joint custody awards demonstrates overwhelmingly that except for "those few, exceptionally mature adults who are able to set aside animosities in cooperating for the benefit of their children," joint custody is not a problem solver, but a pernicious problem causer. J. Rainer Twiford, J.D., Ph.D., *Joint Custody: A Blind Leap of Faith?*, Behavioral Sciences & the Law, Vol. 4, No. 2, p. 157–68 (1986). The Appellant's Brief cites numerous articles reviewing some of this social science data:

1) Wall Street Journal (July 15, 1991, p. B1).

2) M. Sun, "1988 Review of Family Law: Clearing House Review," p. 944 (January 1989).

3) T.W. Lowe, "Evaluating Parental Potential for Joint Custody," 69 Mich. B.J. 140–43 (Fall 1990).

4) D. Post, "Arguments Against Joint Custody," 4 Berkley Women's Law Journal 316–25, (1989, 90).

5) McKinnon and Wallerstien, "Joint Custody and the Preschool Child," 4 Behavioral Sciences and the Law 169 (1986).

6) Steinnman, Zemmelman and Knoblauch, "A Study of Parents Who Sought Joint Custody Following Divorce: Who Reaches Agreement and Sustains Joint Custody and Who Returns to Court," 24 Journal of American Academy of Child Psychiatry 554–62 (1985).

The Majority Opinion acknowledges the existence of this empirical data, and cites no data to the contrary. None is cited to us. Yet the Majority disregards its significance.

A report prepared in February 1983 by the Ad Hoc Committee on Family Dissolution of the Kentucky Psychological Association, entitled "Custody and Visitation Patterns in Children of Divorce," sums up as follows:

"It should be recognized that joint custody is not a panacea. It requires that the parents have the emotional capacity and the psychological commitment to resolve their differences and engage in communication, cooperation, and compromise. Obviously, it cannot be imposed on a fighting couple as a way of resolving their dispute. It is also not for those who have not thought through its implications.... It should not be used as a 'cop-out' by the court to avoid the careful weighing of all of the variables determining the child's best interests...."

The Trial Commissioner in this case was tuned in to reality. His findings, after a lengthy, video-taped hearing were as follows:

"... cooperation and communication between the parties is required for an award of joint custody.... In this case, it is obvious to the Court [Commissioner] that the parties cannot agree or cooperate to the extent necessary to accommodate a joint custody award."

The trial court neither heard the evidence nor reviewed the tapes, but awarded joint custody contrary to this finding, stating it was the court's "policy" to "grant joint custody of children whenever possible to do so," and that "the national trend is for joint custody." The trial court was mistaken as to "policy" and the present direction of the "national trend." Neither reason suffices to support a finding in favor of joint custody in this case.

Obviously there are cases where, based on the evidence presented (not policy or trend), joint custody is an appropriate arrangement, and the custody statute makes it available for such cases. But the decision to award it should turn on individualized fact-finding, not inappropriate policy considerations. The Majority has concluded that the trial court could accept the Commissioner's fact-finding, yet reach a contrary result as to whether joint custody rather than sole custody was appropriate. It is plainly mistaken. The question of the proper custodial arrangement is a fact question. It depends on what evidence was presented. The law allows custody placed only where the facts justify, and that can be decided only by the fact-finder. The trial court could not accept the facts found by the Commissioner as to the parents' suitability to share custody, yet disregard his decision on the ultimate fact based on policy considerations. These policy considerations are not part of the law, and disregard the empirical data undermining their cogency.

Before awarding joint custody the trial court should be required to find that these parties are *presently* emotionally mature adults capable of cooperating and sharing in the decision-making involved in raising this child, not that "hopefully" they will become so. The final order of the trial court in this case is to the contrary:

"The Court recognizes that this has been another very bitter divorce in which the parties and their attorneys have hotly contested nearly every issue.... *Hopefully, after this divorce* is finalized, the parties, who are mature individuals and not teenagers, will cooperate with the give and take that is in the best interest of the child." [Emphasis added.]

This is not good enough. Rather than finding what the record shows is in the best interest of the child, it evades the issue.

This was a 2–1 decision in the Court of Appeals. The Dissenting Opinion by Judge Huddleston embodies what the law should be:

"In considering a joint custody arrangement, it is imperative that the court determine whether the parties possess the maturity necessary to suppress their enmity toward one another when addressing issues affecting their child. Without an atmosphere allowing a cooperative exchange of ideas, the parties will tend to inflict their personal animosities on the child. The detrimental and destabilizing effect of a joint custodial arrangement between uncooperative parents is apparent."

The trial court had the power to decide the facts *de novo*. But when the court utilized a Commissioner for preliminary fact-finding, CR 52.01 required that findings of fact made by the Commissioner not be set aside unless and until the court reviewed the evidence and reached a different conclusion. Fact-finding is a function of an opportunity to evaluate the evidence firsthand and assess the credibility of the witnesses. *McNamee v. McNamee*, Ky., 432 S.W.2d 816 (1968). In the present case the trial court did not evaluate the evidence firsthand, or even secondhand. He simply considered the exceptions filed by the parties and declined to follow the Domestic Commissioner's custody finding, based on a policy which is not the law and is a misperception of the national trend.

The testimony in this case overflows with bitterness and recrimination between the parents, hostile charges and counter-accu-

sations. As Judge Huddleston summarized:

"In this case, the parties never lived together and established a foundation of mutual trust and cooperation. The record strongly suggests, as the Commissioner observed, that while both parties may be suitable custodians, they are unable to communicate and to cooperate in the raising of their son."

At the least, this case should be remanded to the trial court with instructions for the trial court to determine the custody issue based on a review of the evidence firsthand.

In support of his preference for joint custody the trial court states, "[s]ince joint custody can be modified it keeps both parents on their good behavior to avoid a change of custody." This wishful thinking has its genesis in the Kentucky Court of Appeals' decision in *Benassi v. Havens*, Ky.App., 710 S.W.2d 867 (1986), stating that a joint custody award is the legal equivalent of no custody: that custody can then be decided later without regard to the statutory constraints on change of custody.

In *Benassi v. Havens*, the Court of Appeals holds:

"It is our view that when joint custody is awarded under KRS 403.270(3) [now (4)] and the parties subsequently disagree, neither KRS 403.340 nor KRS 403.350 applies.... As a practical matter, joint custody is no award at all when considering modification of the arrangement." *Id.* at 869.

But a joint custody award is a child custody award under KRS 403.270, just the same as is a sole custody award under this same statute. A decree awarding joint custody does not provide a loophole to avoid the statutory mandate in KRS 403.340 and .350, covering modification of a custody decree. KRS 403.340(2) provides that unless the parties have agreed to the modification or the child has been integrated into the family of the petitioner with the consent of the custodian, the child's custody *shall not be changed absent proof:*

"(c) The child's present environment endangers seriously his physical, mental, moral, or emotional health, and the harm likely to be caused by a change of environment is outweighed by its advantages to him."

In *Quisenberry v. Quisenberry*, Ky., 785 S.W.2d 485 (1990), our Court recognized that the policy behind the statute is to stabilize the child's circumstances and stop further fighting over his custody unless the child is in serious physical, mental, moral or emotional danger. The best interest of the child, as well as the parents, is served by forcing quarreling parents to adapt to new circumstances, to accept the finality of the decree and their new arrangements, to live in the present. Children need to know where they stand, and to go forward from there.

Significantly, *Benassi* offers no citation of authority, case or statute, for the "view" expressed: that joint custody is no award at all when considering modification of the arrangement. Nothing in subparagraph (4) of KRS 403.270 suggests that the General Assembly considered joint custody to be "no award at all." There is no statutory mandate that the statutes on change of custody do not apply to an award of joint custody. But it is this view that change of custody barriers did not apply in joint custody cases that the trial judge gives as one of the reasons underlying his preference for a joint custody arrangement.

The decision in *Benassi* and in this case go against the grain of KRS 403.340–.350, as explained in *Quisenberry*. The purpose of the statutory barriers to modification in KRS 403.340 and .350 is to give children a stable environment in which to grow. That stability is no less important when there is joint custody than when one parent has sole custody.

The writer of this Dissent agrees wholeheartedly that it is desirable for a noncustodial parent to have as much continuing parental relationship with his child as possible. Between warring parents this can best be accomplished by providing full visitation rights to the noncustodial parent insofar as reasonably possible.

In all likelihood, the parent with liberal visitation who would disregard the relationship with his child because he has only visitation rights, rather than custodial rights, will fail to fulfill the child's needs for emotional support in any event. If a parent is so immature and so hostile that a joint custody arrangement is necessary before he will provide his child with personal contact, financial and emotional support, his very attitude proves him unsuited to the task of carrying out a joint custody arrangement.

*Benassi v. Havens* manufactures joint custody into a vehicle permitting the trial court to postpone deciding the difficult custody question presented by quarreling parents. Without exception, the social science data amassed on this subject proves that the joint custody arrangement is a vehicle peculiarly unsuited to resolve quarreling over a child; indeed, it is counterproductive to this end. The worst interest of the child rather than the best interest of the child is served by fostering a continuing instability in the child's custodial arrangements.

The evidence of post-decree proceedings in the present case illustrates the point. A month after the decree the parties were back in the trial court quarreling over what time of the day on every other Christmas Eve the appellee had to end his visits with the child. Parents who cannot resolve this simple difference on their own can hardly be expected to share jointly the responsibility to determine the child's upbringing in matters of education, health care, religious training, and similar fundamental decisions.

Without giving the matter much thought, the Majority seems to have embraced the Court of Appeals' decision in *Benassi v. Havens*. At least, one would assume so based on the following quote from the Majority Opinion:

"It should not be overlooked that to achieve such cooperation, the trial court may assist the parties by means of its contempt power and its power to modify custody in the event of a bad faith refusal of cooperation. *Benassi v. Havens*, Ky.App., 710 S.W.2d 867 (1986)[.]"

It is a serious mistake to adhere to *Benassi* when we have never considered its ramifications, much less whether it properly decides whether the statutes on change of custody apply.

Finally, the Majority Opinion criticizes the Court of Appeals' Opinion on joint custody in *Hardin v. Hardin*, Ky.App., 711 S.W.2d 863 (1986), and states "we endorse many of the views expressed by the Court of Appeals in *Chalupa v. Chalupa*, Ky. App., 830 S.W.2d 391 (1992)." In *Hardin*, the Court of Appeals reversed a joint custody award rendered by the trial court because of the enmity and disagreement between the parents, stating "joint custody cannot be in the best interests of the children where the parents are not sufficiently understanding and mature enough to cooperate in such an arrangement. Petrilli's *Kentucky Family Law*, § 26.86 (Supp. 1985); Revell & Slyn, *Kentucky Divorce* § 9.6 (1984)."

*Chalupa* had facts very similar to the present case and was decided by the same panel of Court of Appeals judges, and by the same split decision (Schroder and Stumbo, JJ., approving joint custody, and Huddleston, J., dissenting). *Chalupa* stands for a proposition that this Court should *never* approve: that it is in the child's best interest to require "a trial court to consider joint custody first, ... a preference for joint custody is in the best interest of the child, even in a bitter divorce...." The *Chalupa* majority, in a triumph of hope over experience, says that by such a decision "the court is encouraging the parents to cooperate with each other and to stay on their best behavior."

The *Chalupa* decision is wrong, and we should disavow it. Our Majority Opinion states:

"While we stop short of endorsing the *Chalupa* preference for joint custody, i.e. 'consider joint custody first,' we endorse many of the views expressed therein."

This rather vague disclaimer confuses rather than clarifies. While we state we "stop short of ... 'consider joint custody first,' " by embracing as a realistic expectancy the

"pie in the sky" philosophy expressed in *Chalupa*, the net result is to encourage trial courts to "consider joint custody first." If this is the result, this case will be an unmitigated disaster for children in cases to come.

A recent article in the Wall Street Journal (July 15, 1991, p. 81) quoted by Judge Huddleston in his Court of Appeals Dissent in this case brings us up-to-date on the impact of joint custody. We quote, in part:

> "Joint custody, once hailed as the ideal child-rearing arrangement for divorced couples, is coming under fire from psychologists, lawyers and embittered parents.
>
> . . . .
>
> Robert Mnookin, Director of the Stanford Center on Conflict and Mediation, which conducted a child-custody study of 1,100 families in California, says, 'Where parents are fighting and remain locked in conflict, joint physical custody can be like carrying out King Solomon's threat. A child can be torn apart psychologically.'
>
> . . . .
>
> ... a study of 700 divorce cases in Cambridge by the Middlesex Divorce Research Group found that couples with joint legal custody were more than twice as likely to relitigate their child-care agreements as couples with sole custody.
>
> Moreover, joint legal custody 'makes no difference in terms of the amount of parents' contact with their kids, the quality of communication between parents, or the rate of compliance with child-support payments,' says Stanford's Mr. Mnookin.
>
> Researchers say joint custody hasn't lived up to its promise because most parents haven't embraced the concept willingly."

Judge Huddleston has accepted what the social science studies have established, and applies it to this case. On the other hand, the Majority Opinion from the Court of Appeals and our Court, is more intuitive than objective.

I fear for the future. I fear for the children whom joint custody decrees will force to live in unstable relationships, subject to uncertain authority. I fear for the emotional damage to children who will be the noncombatant casualties in future courtroom battles.

For the benefit of the children who must bear the consequences of the problems that will be caused by this decision, I urge the General Assembly to take suitable steps. Joint custody should not be abolished as an available option, because there are cases where such a finding is appropriate. It is, however, only appropriate upon proof that both parents are presently emotionally mature and psychologically suited to the task of sharing custody cooperatively. Further, in order to provide the children of divorce a stable environment in which to grow, so far as it is humanly possible to do so, I urge the General Assembly to repair the barriers against casual change of custody established by KRS 403.340–.350, but breached by the decision of the Court of Appeals in *Benassi v. Havens, supra,* and by the language of this Opinion.