Ahmosis ATON, Appellant,

v.

Trinette ATON, Appellee.

No. 94–CA–2234–MR.

Court of Appeals of Kentucky.

Dec. 8, 1995.

Harold S. Greene, Jr., Lexington, for appellant.

James E. Greer, II, Versailles, for appellee.

Before DYCHE, GARDNER and KAREM[1], JJ.

KAREM, Judge.

Ahmosis Aton appeals the Woodford Circuit Court's award of primary residential custody of his daughter, Tanesha Aton, to the appellee, Trinette Aton. We affirm.

The issue in this case is whether the trial judge properly awarded primary residential custody of Tanesha to her mother. A domestic relations commissioner originally heard the custody dispute. The parties agreed to share joint custody of the child; however, they contested who should be the primary residential custodian. The commissioner awarded primary residential custody to the

---

1. This opinion was prepared and concurred in prior to Judge Karem's departure from the Court on November 30, 1995.

father. In his findings, he noted that, if the mother were awarded custody, the child would spend a great deal of time with her maternal grandmother. Thus, the commissioner reasoned that primary residential custody with her father would serve Tanesha's best interests. The appellee excepted to the commissioner's findings. The trial judge, in reviewing the commissioner's decision, stated that, while the decision was a very close one, Tanesha's best interests were served by awarding her mother primary residential custody. The trial court's opinion stated as follows:

> Recognizing that both parents appear to be suitable custodians, this Court cannot help but believe that some advantage to the child is served by having as much contact with family members during baby-sitting periods as possible. In this Court's opinion, that circumstance is a significant factor in nurturing the child.
>
> *       *       *       *       *       *
>
> Because this Court believes that the best interest of the child would be served by having as much contact, during baby-sitting periods, with family members, this Court believes that the Respondent should be the *primary custodial parent* in this joint custody arrangement. (Emphasis added).

Mr. Aton argues that, while Ms. Aton is the *de jure* primary residential custodian of Tanesha, Tanesha's maternal grandmother is the *de facto* custodian. He premises this argument on the fact that Tanesha spends several nights a week with her grandmother, while Ms. Aton lives in another residence in a neighboring county. Ms. Aton does visit Tanesha during the week, and has her on the weekends that she is not with her father. However, Ms. Aton and Tanesha do not reside in the same house overnight during the school year.

■ Mr. Aton urges us to apply the same standard in this case that we would apply to review a custody contest between a parent and a non-parent. That standard would require us to find a parent unfit before granting custodial rights to the non-parent. *Chandler v. Chandler,* Ky., 535 S.W.2d 71 (1975); *Jones v. Jones,* Ky.App., 577 S.W.2d 43 (1979). Mr. Aton admits that there are

Kentucky cases which hold that "the selection of whom [the parent] will leave the child with, at what times, and for how long, is an incident of [the parent's] own custodial function and discretion." *Calhoun v. Calhoun,* Ky., 559 S.W.2d 721, 722 (1977). However, he distinguishes this rule from the present case by claiming that the rule applies only if the baby-sitter, often a grandparent, and the parent reside in the same household. In this case, Tanesha's mother and grandmother live just a few miles apart. We do not believe that the absence of cohabitation between the appellee and her mother is a sufficient basis to depart from the law as set forth in *Calhoun.* Thus, we will not evaluate this as a parent/non-parent contest.

At the outset, we note that the parties and the trial judge in this case have inappropriately commingled joint and sole custody terminology. Such misuse of terms frequently has become a source of confusion for courts and litigants alike. We take this opportunity to clarify some of these recurrent misunderstandings.

■ Joint custody is an arrangement in which both parents *equally* share decision-making authority concerning major areas of their child's upbringing. As defined by this court in *Burchell v. Burchell,* Ky.App., 684 S.W.2d 296, 299 (1984):

> Joint custody is an arrangement whereby both parents share the decision making in major areas concerning their child's upbringing, a role traditionally enjoyed by both parents during the marriage, but which is usually reposed solely in one parent following dissolution. *See* R. Petrilli, *Kentucky Family Law* § 26.8(b) (1969 and Supp.1983).

*See also, Chalupa v. Chalupa,* Ky.App., 830 S.W.2d 391 (1992).

■ The inherent nature of joint custody negates the possibility of vesting one parent with the primary authority to make decisions concerning the upbringing of the child. Although joint custody does not require an equal division of physical residence between the parents, the authority for making major decisions concerning a child's upbringing— including with whom and for how long the

child will spend time—is shared equally between the parents. This concept, though often ignored, was enunciated clearly in the *Burchell* case:

> That the appellant has physical possession of the children does not accord her superior authority to determine how the children will be raised. Although she is responsible for their day-to-day care while they are in her possession, major decisions affecting the children must be made in concert with their other parent, the appellee.

*Burchell,* 684 S.W.2d at 299. Our Supreme Court also expressed this concept in its most recent case concerning joint custody, *Squires v. Squires,* Ky., 854 S.W.2d 765, 768 (1993):

> In theory, the child would continue to be reared by both parents and have the benefit of shared decision-making with respect to important matters, with neither parent being designated as the primary custodian and the other relegated to a secondary status. Clearly, it was this ideal which motivated the General Assembly to declare that trial courts may grant joint custody, but place it within the context of the entire custody statute, KRS 403.270, and limit it by the best interest test.

The confusion often arises when litigants and courts use the term "primary custody" to denominate the parent with whom the child resides a better part of the time, i.e., with whom the child primarily resides. In fact, our very own Court has contributed to the confusion with the following statement in *Chalupa:*

> There may be a misunderstanding here of terminology because even in joint custody cases, there is a *primary custodian* and the issue is not where the child stays. (Emphasis added).

*Chalupa,* 830 S.W.2d at 393. We believe this to be a misstatement of the law. There can be no "primary custodian" in the joint custody context. Joint custody prohibits a court from selecting a primary custodian from two joint custodians. Such an act annihilates shared decision-making, a fundamental principle of joint custody. Although the statement quoted above is a distortion of the law, the *Chalupa* opinion reiterates that although one parent may have primary physical possession, the major decision-making is shared. *Id.*

Naturally, the possibility exists that two divorced parents with joint custody may be unable to agree about decisions concerning the child's upbringing. In that instance, the trial court resolves their dispute, according to the best interests of the child. *Burchell* recognized this avenue of resolution:

> If, as in the instant case, the parties to a joint custody agreement are unable to agree on a major issue concerning their child's upbringing, the trial court, with its continuing jurisdiction over child custody matters, must conduct a hearing to evaluate the circumstances and resolve the issue according to the child's best interest. Once the parents have abdicated their role as custodians to the trial court, its decision is binding on the parties until it is shown that the decision is detrimental to the child physically or emotionally, or is no longer in his best interest.

*Burchell* at 300. We also note that any time the joint custodians come before the trial court, calling the joint custody arrangement into question, the court should review the custody status as if no custody determination had been made, in accordance with the best interests of the child. *Benassi v. Havens,* Ky.App., 710 S.W.2d 867 (1986); *Erdman v. Clements,* Ky.App., 780 S.W.2d 635 (1989).

In the case at bar, we believe the trial judge committed the familiar error of labeling the parent with whom Tanesha physically resided most of the time as the "primary custodian." The trial judge clearly stated in his order that the parties had agreed to joint custody. However, in deciding which parent should have greater residential time during the school year, he decided in favor of Ms. Aton. He made the decision according to the standard of Tanesha's best interests, as indicated in the above excerpt from his Order.

We are constrained from overturning the findings of the trial judge unless they are clearly erroneous. *Jones,* 577 S.W.2d at 46. This standard is especially true in domestic relations cases. *Id.* In this case, both the commissioner and the trial judge stated that the decision was an extremely close one. We agree that there was sufficient evidence to

support an award of primary residence to either parent. However, the trial judge held the ultimate power of decision in this case, and under our standard of review we cannot say that his ruling was clearly erroneous.

The judgment of the Woodford Circuit Court is affirmed.

All concur.