Phillip Stuart FENWICK, Appellant,

v.

Susan S. FENWICK, Appellee,

and

Jennifer L. Huck, Appellant,

v.

Benjamin F. Huck, Jr., Appellee.

Nos. 1999–SC–1055–DG,
2000–SC–0697–DG.

Supreme Court of Kentucky.

Sept. 18, 2003.

As Modified Oct. 8, 2003.

Dwight Preston, Lewis and Preston, Elizabethtown, Counsel for Appellant, Phillip Stuart Fenwick.

Regina Rapier Beckman, Jason P. Floyd, Fulton, Hubbard and Hubbard, Bardstown, Counsel for Appellee, Susan S. Fenwick.

Robert S. Silverthorn, Jr., Louisville, Counsel for Appellant, Jennifer L. Huck.

James L. Theiss, LaGrange, Counsel for Appellee, Benjamin F. Huck, Jr.

Opinion of the Court by Justice KELLER.

## I. ISSUE

In each of the present appeals, a primary residential custodian in a joint custody arrangement seeks to relocate with the parties' children over the other parent's objection. Our resolution of the issues presented requires us to determine both: (1) whether a primary residential custodian's desire to relocate *requires* modification of the previous joint custody award; and (2) whether the relocation, standing alone, *permits* a trial court to modify the joint custody award by changing the primary residential custodian designation. More fundamentally, we must determine the circumstances under which a trial court may modify an award of joint custody, and, in so doing, resolve lingering questions as to the proper standard for modification in joint custody cases.

In *Fenwick v. Fenwick*, 1999–SC–1055–DG, the primary residential custodian, Susan Fenwick, wishes to relocate thirty-five (35) miles to a nearby county. The trial court, applying the best interest standard, denied Susan Fenwick's relocation request, and held that, if she chose to relocate, it would modify the joint custody award by designating Phillip Fenwick as primary residential custodian. The Court of Appeals concluded that Susan Fenwick's proposed relocation did not require modification of the joint custody award and, moreover, held that the trial court had no authority to reconsider the joint custody award because there was insufficient threshold evidence of bad faith or an inability to cooperate. Accordingly, it reversed the trial court and permitted Susan Fenwick to relocate with the children. In *Huck v. Huck*, 2000–SC–0697–DG, the primary residential custodian, Jennifer Huck, wishes to relocate to an adjoining state. The trial court refused her request because its original order prohibited her from moving the children outside the state without the approval of either her ex-husband or the court, and the court denied its approval after finding that she had failed to advance sufficient and compelling reasons for the relocation. The Court of Appeals held that the trial court could prohibit the primary residential custodian from relocating with the children because the prospect of an out-of-state move may qualify as a sufficient change in circumstances to warrant modification of custody under KRS 403.340, the general modification statute.

Was a failure to show lack of cooperation by the parents in *Fenwick v. Fenwick* a sufficient basis to deny custody modifica-

tion? Was the proposed relocation out-of-state in *Huck v. Huck* a circumstance that would justify custody modification under KRS 403.340? Because we hold that modification of joint custody must meet the requirements of KRS 403.340 and that the primary residential custodian's relocation, by itself, is insufficient to require modification of a joint custody award, we hold that modification of the joint custody award was neither required nor permitted in either case. Accordingly, we hold that the primary residential custodians may relocate as they propose and we therefore affirm the Court of Appeals in *Fenwick v. Fenwick* and reverse the Court of Appeals in *Huck v. Huck*.

## II. BACKGROUND

### A. *FENWICK v. FENWICK*

Susan and Phillip Fenwick were married in 1986. Their marriage produced two daughters, Stephanie and Paige. The Fenwicks lived together as a family until Susan and Phillip separated in February 1997. Their marriage was dissolved in May 1997; however, at that time, the trial court reserved for future adjudication child custody and other issues.

In an order[1] entered June 27, 1997, the trial court awarded the parties temporary joint custody of their two children, designated Susan Fenwick as the primary residential custodian,[2] and established a time-sharing[3] schedule that set forth when Phillip Fenwick would have the children. Under the *court's time-sharing order,* Phillip spends time with his daughters daily during the week from 3:00 p.m. to 6:00 p.m. In addition, the children stay with him each Tuesday afternoon after work through 6:00 p.m. on Wednesday as well as every other weekend. Under this time-sharing arrangement, the children spend almost equal time with both parents.

At Phillip Fenwick's request, the marital residence was sold, and Susan Fenwick was thus required to seek a new residence for herself and the children. As a result, she filed a motion requesting the court's approval to relocate with the children to a three-bedroom home owned by her brother in Jefferson County, a distance of thirty-five (35) miles from her present residence.

Susan Fenwick is employed by Louisville Gas & Electric, and she commutes from Bardstown to Louisville each day. A move to Jefferson County, she asserts, would eliminate her daily commute and confer additional benefits upon her and the children. She states that relocation to Jefferson County will allow her to be closer to her place of employment and thereby give her more time to spend with Stephanie and Paige. Moreover, she suggests that, after relocating to Louisville, she will be in a better position to respond promptly to any emergency needs her daughters may have. She also points out that after the move she and the children will continue to

---

1. The trial court's decision was set forth in a document captioned, "Findings of Fact, Conclusions of Law and Supplemental Judgment," but which provided, "This is a pendente lite order." *See* CR 54.02.

2. The trial court did not use the term "primary residential custodian" but its order provided, "The children shall primarily reside with Susan ....." *See infra* Part III(B) for discussion of the significance of the primary residential custodian label.

3. The term "time-sharing" or "shared time" is frequently used by family practitioners and trial courts in lieu of "visitation" "in recognition that a parent's relationship with a child deserves a label somewhat different from that attached to a weekend guest." 16 L. Graham & J. Keller, Kentucky Practice, Domestic Relations Law § 22.1 (2nd ed. West Group 1997) (hereafter "Graham & Keller").

live close to family because her brother resides with his family in a home nearby and her brother's wife, along with his daughter, will help care for the children.

Phillip Fenwick objected to the motion, arguing that relocation is contrary to the children's best interests. He maintained that the established time-sharing schedule better serves the children's needs because: (1) the schedule allows the children to see, on a regular basis, him and other people with whom the children are close, and (2) Jefferson County is a crime-ridden, traffic-jammed, and pollution-filled area, which is unsafe for raising young children.

In an interlocutory order entered August 14, 1997, the trial court, applying the best interest standard, found "that moving the children from an area where they have significant interrelationships with family members and adjustment to the community would serve to exacerbate the ill effects of this divorce" and therefore overruled Susan Fenwick's motion to relocate. Phillip asked the trial court to designate him as primary residential custodian if Susan insisted upon relocating to Jefferson County, and the trial court's order provided Susan with that alternative:

> ... Susan's motion to relocate the children is hereby overruled. Susan,

however, is granted the option to relinquish her role as primary caregiver to Phillip and propose to the court a new schedule of time sharing should this move to Jefferson County be of such significance to so warrant a change.

By an order entered December 8, 1997,[4] the trial court made final and appealable its prior rulings that had awarded the parties joint custody, designated Susan Fenwick as the primary residential custodian, and denied Susan Fenwick's motion to relocate to Jefferson County with the parties' children. In its order, the trial court distinguished *Wilson v. Messinger*,[5] as applicable only to sole custody arrangements. The court also reiterated that the best interest of the children would not be served by the children's relocation with Susan from Nelson County to Jefferson County because "Stephanie (age 6) and Paige (age 3) have resided in Nelson County since birth[,]" and "[t]heir grandparents reside in Nelson County as do most of their close relatives."

Susan Fenwick successfully appealed the trial court's ruling that, in effect, had forced her to choose between her proposed move and retaining her status as primary residential custodian. In reversing the trial court's decision, the Court of Appeals

4. This order adopted "Findings of Fact, Conclusions of Law and Supplemental Judgment" ("Supplemental Judgment") that were apparently prepared by the court's domestic relations commissioner and that the record reflects were tendered on October 2, 1997. The Supplemental Judgment was signed, however, by the trial judge, stamped entered by the clerk on both December 8, 1997 and December 16, 1997, and provided, "This is a final and appealable judgment and there is no just cause for delay." Both the December 8, 1997 order and the December 8/16, 1997 Supplemental Judgment referenced the June 27, 1997 order awarding joint custody to the parties. The December 8, 1997 order noted that the adoption of the December 8/16 Supplemental Judgment would effectively overrule

Susan Fenwick's motion to relocate. Regardless, the net effect of the December 8, 1997 order and the December 8/16, 1997 Supplemental Judgment was to finally award joint custody to the parties, denominate Susan Fenwick as the primary residential custodian, and deny her motion to relocate with the children to Jefferson County.

5. Ky., 840 S.W.2d 203 (1992). *Wilson* was decided in the context of sole custody, and in the present case, the trial court indicated it would be inclined to follow its holding if the arrangement here were one of sole custody. *See infra* Part III(D) for a discussion of *Wilson*.

reasoned that the evidence was insufficient to find the necessary bad faith or inability to cooperate required by *Mennemeyer v. Mennemeyer*,[6] and thus held that the trial court lacked the authority to dictate a custody modification triggered solely by Susan Fenwick's move to Louisville. Phillip Fenwick challenges that decision in this Court.

## B. *HUCK v. HUCK*

Jennifer L. Huck and Benjamin F. Huck, Jr. were married on January 10, 1987. Two daughters, Nicole and Jessica, were born of the marriage. The parties separated in 1993, and Jennifer Huck filed a petition for dissolution of the marriage in the Oldham Circuit Court on April 27, 1995. On June 5, 1995 an agreed order was entered awarding Jennifer temporary custody of the children, "subject to reasonable visitation by [Benjamin Huck]." The next year, on March 14, 1996, the trial court dissolved the parties' marriage but reserved its decision as to permanent custody and other issues for later consideration.

In an interlocutory order,[7] entered December 18, 1997, the trial court awarded the parties joint custody of the children, designated Jennifer Huck as primary residential custodian,[8] and provided, "[Jennifer Huck] is to determine the residency of the children and their education." The order further provided, however, that the children's residency could not be changed from Kentucky absent the parties' agreement or the court's approval:

No. 4. The Court finds that Kentucky is the home state of the children and directs that neither parent is to remove the children from the State of Kentucky with the intent to establish a separate residence, absent an agreement between the parties or as otherwise Ordered by the Court. This finding by the Court will avoid one party and/or the children being detrimentally impacted by a possible change of residency without prior agreement as to how contacts are to be handled.

Benjamin Huck's parents owned the parties' marital residence, and Jennifer continued to reside there with the children until Benjamin's parents required them to move. They then moved to Jennifer's parents' residence, which was also in Oldham County. Jennifer's father, however, had recently retired, and her parents were in the process of moving to Collegedale, Tennessee.

For a variety of reasons—including (1) the fact that Jennifer Huck and her children could live rent-free in a house that Jennifer's parents had purchased for her in Collegedale, (2) Jennifer's desire to have her children instructed in a Seventh Day

---

6. Ky.App., 887 S.W.2d 555 (1994), *overruled by Scheer v. Zeigler*, Ky.App., 21 S.W.3d 807 (2000).

7. Although not designated as interlocutory, other matters remained for the trial court's consideration. CR 54.02(1).

8. The trial court employed the term "primary custodian." This is undoubtedly a misnomer because the trial court awarded joint custody. *Aton v. Aton*, Ky.App., 911 S.W.2d 612, 615 (1995) ("There can be no "primary custodian" in the joint custody context. Joint custo-dy prohibits a court from selecting a primary custodian from two joint custodians. Such an act annihilates shared decision-making, a fundamental principle of joint custody. Although the statement quoted above is a distortion of the law, the *Chalupa* [*v. Chalupa*, Ky., 830 S.W.2d 391 (1992)] opinion reiterates that although one parent may have primary physical possession, the major decision-making is shared."). Accordingly, it is apparent that the trial court intended to designate Jennifer Huck as the primary residential custodian.

Adventist school located in Collegedale,[9] (3) improved employment opportunities,[10] and (4) the support of her family—Jennifer wished to move to Collegedale with the children and filed a motion with the trial court on June 1, 1998 [11] for leave to do so. In her motion, she offered to share the transportation expenses for the children to visit with Benjamin in Oldham County and to amend the present time-sharing schedule so that the children would spend additional time with their father during their visits with him.

Jennifer Huck's relocation motion was noticed for a hearing on June 12, 1998, but, due to the trial judge's illness, the hearing was postponed until September 16, 1998. However, on July 15, 1998, Jennifer filed a notice to advise the trial court that the children's school in Tennessee was to begin on August 11, 1998. The notice stated that it "supplements the Notice–Motion–Order filed on her behalf [on] May 29, 1998, in which the Court was advised that [she] would be moving from Oldham County to Chattanooga[.]" [12] Thus, Jennifer contends that both the trial court and Benjamin became aware that she and the children would be moving to Collegedale in time for the children to begin attending school on August 11, 1998.

Following Jennifer's arrival in Tennessee with the children, Benjamin filed a motion to hold Jennifer in contempt for violating the December 1997 order by removing the children from Kentucky without his agreement or the trial court's approval. After a show-cause hearing held on August 28 and September 2, 1998, the trial court found that Jennifer had moved "not as a result of a job reassignment, a remarriage and transfer, or other factors that were beyond [her] control[.]" The trial court found Jennifer in contempt after determining "that [she] has not advanced sufficient compelling and necessary reasons for the relocation to the state of Tennessee" and that "there is no agreement by [Benjamin Huck] nor a Court Order in place allowing her to do so[.]" The court provided, however, that Jennifer could purge herself of contempt by returning the children to Oldham County and enrolling them "in their previous schools not later than Monday, September 28, 1998." By order entered September 18, 1998, all prior interlocutory orders, including those relating to custody of the children and to Jennifer's motion to relocate, were made final and appealable.

Jennifer was unsuccessful in her appeal of the trial court's denial of her request to relocate. While appropriately acknowledging that the trial court could not prevent Jennifer from "seeking employment, marrying, or becoming involved in other circumstances which would result in a move from the Commonwealth of Kentucky," the Court of Appeals affirmed the trial court's ruling denying Jennifer's motion to relocate with the children. The Court of Appeals reasoned that the trial court continued to retain jurisdiction to review custody and, "the prospect of a move out of state may qualify as a change in circumstance which could result in a

9. Apparently, a Seventh Day Adventist school was also available in Oldham County.

10. Jennifer Huck had worked for her father at a medical clinic in Oldham County, and apparently, a job was still available to her there even after her father left. While in Collegedale, Jennifer Huck, apparently, secured a job and enrolled in Southern Adventist University, with the hope of improving her employment opportunities with a college degree.

11. This motion is later referred to by Jennifer as being filed on May 29, 1998.

12. Collegedale is located in the Chattanooga area.

modification of custody, provided that the statutory guidelines in KRS 403.340 are followed." Accordingly, the Court of Appeals held that the trial court did not err in restricting Jennifer's ability to move the children out of state and thus affirmed the trial court's ruling.[13] Jennifer now appeals to this Court.

## III. ANALYSIS

### A. JOINT CUSTODY

The legislature has authorized Kentucky trial courts to make an award of joint custody "if it is in the best interest of the child."[14] This Court has declined to enun-ciate a preference for joint custody,[15] but, instead, has held that "joint custody must be accorded the same dignity as sole custody and trial courts must determine which form would serve the best interest of the child."[16] And, to ensure meaningful application of the best-interest standard in individual cases, the legislature has set forth numerous factors for a trial court to consider in its determination of what type of custody arrangement will best serve the child's interests.[17] In addition to these statutory considerations, this Court has noted that the likelihood of future cooperation between the parents regarding decisions pertinent to raising the child is a relevant factor in determining whether to

---

13. By order entered August 14, 2000, the trial court "reaffirm[ed] the imposition of joint custody" and its "designation of primary care custodian and secondary custodian," and denied Jennifer Huck's request that the children be returned to her primary care and also her request for leave to take the children and return to Tennessee. Jennifer Huck had been granted intermediate relief by the Court of Appeals; however, she purged herself of contempt by returning the children to Oldham County.

14. KRS 403.270(5).

15. *Squires v. Squires*, Ky., 854 S.W.2d 765, 769 (1993) ("[W]e stop short of endorsing the *Chalupa* preference for joint custody, i.e. 'consider joint custody first[ ].'"). We would note, however, that by statute the court is required to give "equal consideration" to each parent, KRS 403.270(2), and therefore, arguably, the legislature intended for the trial court, at least, to begin with a preference for joint custody when it authorized the granting of joint custody.

16. *Id.* at 770.

17. KRS 403.270(2):

(2) The court shall determine custody in accordance with the best interests of the child and equal consideration shall be given to each parent and to any de facto custodian. The court shall consider all relevant factors including:
(a) The wishes of the child's parent or parents, and any de facto custodian, as to his custody;
(b) The wishes of the child as to his custodian;
(c) The interaction and interrelationship of the child with his parent or parents, his siblings, and any other person who may significantly affect the child's best interests;
(d) The child's adjustment to his home, school, and community;
(e) The mental and physical health of all individuals involved;
(f) Information, records, and evidence of domestic violence as defined in KRS 403.720;
(g) The extent to which the child has been cared for, nurtured, and supported by any de facto custodian;
(h) The intent of the parent or parents in placing the child with a de facto custodian; and
(i) The circumstances under which the child was placed or allowed to remain in the custody of a de facto custodian, including whether the parent now seeking custody was previously prevented from doing so as a result of domestic violence as defined in KRS 403.720 and whether the child was placed with a de facto custodian to allow the parent now seeking custody to seek employment, work, or attend school.

award joint custody.[18]

■ Our statutes do not define "joint custody." Thus, the parties' custody agreement[19] will often define it, or the trial court's decree will explain in detail what the court intends by its award of joint custody. As such, the parties' agreement or the court's decree might well require joint decision-making on all major issues, but equal decision-making power is not required for joint custody, and parties or trial courts are free to vest greater authority in one parent even under a joint custody arrangement. In fact, it is not unusual for the parties or the court[20] to assign the authority for certain decisions solely to one party, *e.g.*, one parent might be allocated the sole power to determine issues regarding education—as occurred in Jennifer and Benjamin Huck's case—and

the other parent might have the final say on health care.[21] However, unlike the decision to award joint custody, a trial court's decisions regarding the allocation of decision-making authority between the parents cannot be based on the best interest of the child because the trial court may assign a major child-rearing decision solely to one party only if it finds, after a hearing, that the failure to assign the authority for a child-rearing decision solely to one party will endanger the child's physical health or significantly impair the child's emotional development.[22]

■ Sometimes, astute, forward-thinking parents will recognize when drafting a joint-custody agreement that even parents with the best of intentions will, from time to time, reach an impasse regarding a shared decision regarding their child.[23]

18. *Squires v. Squires, supra* note 15 at 769 ("By what standard then should a trial court determine whether joint custody should be granted? Initially, the court must consider those factors set forth in KRS 403.270([2]). By application of these, the child whose custody is being litigated is individualized and his or her unique circumstances accounted for. In many cases, appropriate consideration of KRS 403.270([2]) may reveal the result which would be in the child's best interest. Thereafter, we believe a trial court should look beyond the present and assess the likelihood of future cooperation between the parents.").

19. KRS 403.180(1) ("To promote amicable settlement of disputes between parties to a marriage attendant upon their separation or the dissolution of their marriage, the parties may enter into a written separation agreement containing provisions for maintenance of either of them, disposition of any property owned by either of them, and custody, support and visitation of their children.").

20. *Squires v. Squires, supra* note 15 at 769 (1993) ("The *Chalupa* decision made a number of points worthy of repetition here. First, it noted that even when joint custody is awarded, the court may designate where the child shall usually reside, and we declare that

the court may make such other orders as are necessary to properly effectuate joint custody. *Chalupa* also recognized that joint custody envisions shared decision-making and extensive parental involvement in the child's upbringing, and in general serves the child's best interest." (emphasis added)). *Cf.* KRS 403.330(1) ("Except as otherwise agreed by the parties in writing at the time of the custody decree, the custodian may determine the child's upbringing, including his education, health care, and religious training, unless the court after hearing, finds, upon motion by the noncustodial parent, that in the absence of a specific limitation of the custodian's authority, the child's physical health would be endangered or his emotional development significantly impaired.").

21. *See Shraberg v. Shraberg*, Ky., 939 S.W.2d 330, 331 (1997) (the parties agreed for the wife to have sole custody; however, the trial court "granted joint custody with [the wife] making decisions as if she were sole custodian").

22. KRS 403.330(1).

23. *Squires v. Squires, supra* note 15 at 771 (Liebson, J. dissenting) ("Social science data amassed since the advent of the joint custody

Thus, it is not uncommon for parents to insert a "tie-breaker" provision in their agreement to resolve such differences of opinion. One type of tie-breaker is referred to as "final decision-making authority," where final authority as to a child-rearing decision is vested in one parent or a third-party in the event that the parents are unable to reach jointly an agreement as to the appropriate decision.[24] Thus, when the parties reach an impasse after making good faith efforts to resolve the matter,[25] the parent or third party vested with final decision-making authority will make the decision, and judicial intervention is unnecessary.

Where the parties or the trial court have not defined joint custody and have thus left it open to interpretation by the court, Kentucky's appellate courts have generally defined the term as an arrangement in which both parents jointly participate in major decision-making concerning their child.[26] Major decisions include the child's education, health care, and religious training.[27]

 Although joint custody consists of both decision-making authority and actual physical custody of the child,[28] joint custody, in its essence, contemplates shared decision-making rather than delineating exactly equal physical time with each parent.[29] In other words, decision-

experiment some 20 plus years ago studying the effects of joint custody awards demonstrates overwhelmingly that except for 'those few, exceptionally mature adults who are able to set aside animosities in cooperating for the benefit of their children,' joint custody is not a problem solver, but a pernicious problem causer.").

24. Other types of "tie-breakers" include submitting to mediation or simply going back to court. Cf. Burchell v. Burchell, Ky.App., 684 S.W.2d 296, 300 (1984) ("If, as in the instant case, the parties to a joint custody agreement are unable to agree on a major issue concerning their child's upbringing, the trial court, with its continuing jurisdiction over custody matters, must conduct a hearing to evaluate the circumstances and resolve the issue according to the child's best interest.").

25. "[A]n agreement granting 'final decision-making power' to one of the parents would implicitly require that parent to exercise such power in good faith." Graham & Keller, supra note 3 at § 21.28 (2nd ed. West Group 2003 Pocket Part).

26. Squires v. Squires, supra note 15 at 769; Aton v. Aton, supra note 8 at 614 ("Joint custody is an arrangement in which both parents equally share decision-making authority concerning major areas of their child's upbringing." (emphasis in original)); Chalupa v. Chalupa, supra note 8 at 393 ("Joint custody recognizes that, although one parent may

have primary physical possession of the child, both parents share the decision making in major areas concerning the child's upbringing, such as which school to attend, etc., a role traditionally enjoyed by both parents during the marriage."); Burchell v. Burchell, supra note 24 at 299 ("Joint custody is an arrangement whereby both parents share the decision making in major areas concerning their child's upbringing, a role traditionally enjoyed by both parents during the marriage, but which is usually reposed solely in one parent following dissolution."); Graham & Keller, supra note 3 at § 21.28 (2d ed.1997) ("At a minimum joint custody involves parental consultation on significant choices to be made with regard to child rearing."); 24 Am Jur 2d, Divorce and Separation § 940 ("Joint custody allows parents to have an equal voice in making decisions and recognizes the advantages of shared responsibility for raising children.").

27. Cf. KRS 403.330(1) ("The custodian may determine the child's upbringing, including his education, health care, and religious training[.]").

28. Louise Graham, The Kentucky Law Survey: Family Law, 86 KY.L.J. 795, 826 (1997–98).

29. Squires v. Squires, supra note 15 at 769; Aton v. Aton, supra note 8; Chalupa v. Chalupa, supra note 8.

making and actual physical custody are not coextensive. And thus, in a joint custody arrangement, unless otherwise agreed to by the parties or decreed by the court,[30] "both parents have equal rights and responsibilities for major decisions concerning their child including, but not limited to, education, health care, and religious training, and the parents will consult with each other on these major decisions."[31] Understandably, however, minor day-to-day decisions concerning the child will, as a matter of necessity, be made by the parent with whom the child is residing at the time.

In awarding joint custody, the court must determine, based on the child's best interest, how the parents will share physical custody of the child. And, we would again note that an award of joint custody does not require an equal division of time with each parent;[32] rather, it means that physical custody is shared by the parents in a way that assures the child frequent and substantial contact with each parent under the circumstances. If the parents continue to reside in close proximity to each other post-dissolution, meaningful time-sharing should not be a problem.

However, if one or both parents relocate some distance from each other, e.g., 50 miles or more,[33] the distance itself complicates the arrangement, and the parties or the trial court, again focusing upon the child's best interest, will need to devise a time-sharing schedule—e.g., one incorporating telephone or e-mail access, and longer periods of time-sharing—that will assure frequent, continuing, and meaningful contact with both parents to the greatest extent possible under the circumstances. We recognize that in most cases the frequency of physical time-sharing will necessarily decrease as the distance between the parents increases.

## B. PRIMARY RESIDENTIAL CUSTODIAN

A child cannot simultaneously reside with both parents, and in most cases, the child will spend more time with one parent than the other—a fact that, in many cases, mirrors the family's situation prior to the parents' separation. Accordingly, in joint custody arrangements, the parties will often agree, or the court will designate, that one of the parents will act as the "primary

30. Although the parties may do so by agreement, we additionally recognize that the trial court may designate one parent the sole right to make certain major decisions while granting both parents equal rights and responsibilities for other major decisions. *See supra* notes 20–22 and accompanying text.

31. This language is taken from the report of the 1998–1999 Special Task Force on Parenting and Child Custody, Research Memorandum (Legislative Research Commission 2000). In addition, other states use similar language in defining the parameters of joint legal custody. *See* 1996 Ala. Acts § 30–3–151(2) (providing that joint legal custody means both parents share equal authority to make decisions concerning education, health care and religion); 23 PA. CONS. STAT. ANN. § 5302 (defining legal custody as shared decision making in the arenas of medi-

cal care, religion and education) (West 2001); VT. STAT. ANN. tit. 15, § 664(1)(A) (1989) (outlining the parameters of legal responsibility as matters concerning education, medical and dental care, religion and travel arrangements).

32. *Squires v. Squires, supra* note 15 at 769.

33. The 1998–1999 Special Task Force on Parenting and Child Custody proposed that "the court ... shall include as a condition of any custody or visitation order a requirement that sixty (60) days advance written notice be given to any other party by any party intending to relocate more than fifty (50) miles away or outside the Commonwealth." Report of the 1998–1999 Special Task Force on Parenting and Child Custody, Research Memorandum No. 490, Kentucky Legislative Research Commission.

residential custodian."[34] Although this term—like "joint custody" itself—has not been statutorily defined in Kentucky, it is generally employed by attorneys and courts alike to refer to the party with whom the child will primarily reside. In such situations, the other parent is awarded what is referred to as "visitation," "time-sharing," or "parenting time" with the child.[35] However, even when joint custody involves essentially equal physical custody—as in Susan and Phillip Fenwick's case—one party may nevertheless be designated the primary residential custodian for other purposes.[36]

 While joint custodians, as previously stated, share major decision-making on all child-rearing decisions unless the parties or the court elect otherwise, designating a party as the primary residential custodian logically confers on that party:

(1) the primary role in minor day-to-day decisions concerning the child; (2) the responsibility for providing a residence, *i.e.,* a "home base," for the child, and (3) the normal routine care and control of the child. Such designation may also carry with it additional legal significance, *e.g.,* a dependency tax deduction,[37] residency for school purposes,[38] and child support.[39] As such, a trial court must again consider the child's best interests in connection with its decision to designate one of the parties as the primary residential custodian.

## C. MODIFICATION OF JOINT CUSTODY

Largely because of divergent decisions from Kentucky's appellate courts, the issue of when and under what circumstances a joint custody arrangement may be modi-

34. Occasionally, the parties will agree that one parent shall be the primary residential custodian for part of the year and the other parent shall be so designated for the remainder of the year. This is more common when the child will actually reside with each parent for one-half of the year.

35. *Cf. Drury v. Drury,* Ky.App., 32 S.W.3d 521, 523 (2000) ("The court found that both parties should have joint custody of the children, and it designated Kimberly as the residential custodian. The trial court awarded Kevin visitation with the children based upon the visitation schedule adopted in that circuit."); *Scheer v. Zeigler, supra* note 6 at 808 ("The parties were awarded joint custody of their son, who was five years old at the time. Donna was designated as the child's primary caretaker, although the child apparently spent more time in the residence of his father than in the residence of his mother."); *Stroud v. Stroud,* Ky.App., 9 S.W.3d 579 (1999) ("Beth and Irvin were awarded joint legal custody of their children, ... with Beth to have primary physical custody."); *Gullett v. Gullett,* Ky. App., 992 S.W.2d 866, 869 (1999) ("Under the agreement, inter alia, the parties were to have joint custody of Jacob, with Tammie being the primary residential custodian; Michael was to have visitation rights pursuant to the

Greenup Circuit Court uniform visitation schedule; and Michael was to pay child support."), *Aton v. Aton, supra* note 8 at 613–614 ("The parties agreed to share joint custody of the child; however, they contested who should be the primary residential custodian. The commissioner awarded primary residential custody to the father."); *Chalupa v. Chalupa, supra* note 8 at 393 ("[E]ven in joint custody cases, there is a primary custodian and the issue is not where the child stays.").

36. Additionally, when the parties' joint custody agreement contains a "tie-breaker" provision, the agreement will typically provide that the parent that the parties have designated as the primary residential custodian shall have final decision-making authority. This is yet another reason that parties in joint custody arrangements will designate a primary residential custodian.

37. 26 USCA § 152(e).

38. KRS 158.030; KRS 158.120(1); KRS 159.010(1).

39. KRS 403.211 & .212; *Snow v. Snow,* Ky. App., 24 S.W.3d 668 (2000); *Brown v. Brown,* Ky.App., 952 S.W.2d 707, 708 (1997).

fied remains unsettled in Kentucky. The opportunity to address the issue was first presented to this Court in *Carnes v. Carnes.*[40] In that case, the parties were granted joint custody of their children, the mother was granted "the actual physical custody of the children for the greater part of the time, with the children to live with her," and the father was granted "the right to have the children with him at reasonable times and for reasonable periods of time." Subsequently, the father successfully sought to modify joint custody and was awarded sole custody of the children. Although this Court, in upholding the trial court's modification of custody, recognized that the modification issue came within the purview of the general custody modification statute, KRS 403.340,[41] *Carnes* possesses scant, if any, precedential value as to the standard for modification of joint custody because the Court characterized the custody joint award in *Carnes* as being "[i]n actuality" an award of sole custody to the mother.[42] Because of this characterization, *Carnes* has been virtually ignored in subsequent cases addressing the modification of joint custody issue.

With the ink barely dry on the *Carnes* decision, the Court of Appeals rendered *Benassi v. Havens*[43] a month later and squarely addressed the issue of modification in the joint custody context. In *Benassi,* the Court held that when joint custodians "subsequently disagree,"[44]

---

**40.** Ky., 704 S.W.2d 207 (1986).

**41.** In 1986, when *Carnes* was rendered and until its amendment in 1992, KRS 403.340 read, in pertinent part, as follows:

(1) No motion to modify a custody decree may be made earlier than 2 years after its date on the basis of affidavits that there is reason to believe that the child's present environment may endanger seriously his physical, mental, moral, or emotional health.

(2) If a court of this state has jurisdiction pursuant to the Uniform Child Custody Jurisdiction Act, the court shall not modify a prior custody decree unless it finds, upon the basis of facts that have arisen since the prior decree or that were unknown to the court at the time of entry of the prior decree, that a change has occurred in circumstances of the child or his custodian, and that the modification is necessary to serve the best interests of the child. In applying these standards, the court shall retain the custodian appointed pursuant to the prior decree unless:

(a) The custodian agrees to the modification;

(b) The child has been integrated into the family of the petitioner with the consent of the custodian; or

(c) The child's present environment endangers seriously his physical, mental, moral or emotional health, and the harm likely to be caused by a change of environment is outweighed by its advantages to him.

**42.** As noted, this was the first case before this Court to address modification of joint custody, and although joint custody had been authorized by the legislature six (6) years before, 1980 Ky. Acts ch. 158, § 1, the concept of joint custody was still in its infancy in Kentucky at the time of the *Carnes* decision. At that time, Kentucky appellate courts had rendered just one decision that described, in general terms only, the meaning of an award of joint custody. *Burchell v. Burchell, supra* note 24. Accordingly, the characterization by the *Carnes* Court of the custody award as not an award of joint custody to the parents, but an award of custody to the mother only is likely incorrect—because the essence of joint custody is shared decision-making, *see supra* Part III(A)—but understandable. The limited facts set out in the *Carnes* opinion do not reveal whether the parents shared in child rearing decision-making. If so, then the custody award was mischaracterized by the Court.

**43.** Ky.App., 710 S.W.2d 867 (1986), *overruled* in *Scheer v. Zeigler, supra* note 6.

**44.** *Id.* at 869.

"modification should be made anew under [KRS 403.270] as if there had been no prior custody determination." [45] In the view of the *Benassi* Court, Kentucky's custody modification statutes, KRS 403.340 and KRS 403.350, [46] are applicable only to modifications of sole custody, and the Court held that a modification of joint custody came within the purview of KRS 403.270. The Court did not mention *Carnes* or cite to any authority in support of its holding; rather, the Court proclaimed that "[a]s a practical matter, joint custody is no award at all when considering modification of the arrangement." [47] *Benassi* was followed three years later by *Erdman v. Clements*, [48] in which the Court of Appeals, citing *Benassi*, again held that, upon disagreement of the joint custodians, the trial court should conduct a *de novo* hearing to determine custody as if it had made no prior custody determination.

Next, in *Chalupa v. Chalupa*, [49] the Court of Appeals addressed modification of joint custody in the context of an appeal from an award of sole custody and a denial of joint custody. The Court stated that "[j]oint custody can be modified if a party is acting in bad faith or is uncooperative[,]"

and that "[t]he trial court at any time can review joint custody and if a party is being unreasonable, modify the custody to sole custody in favor of the reasonable parent." [50] Thus, *Chalupa* appeared to change the standard for modification of joint custody from one of simple disagreement by the parties to one requiring a finding by the trial court that one of the parties is acting in bad faith or being uncooperative.

Subsequent to the Court of Appeals's decisions in *Benassi, Erdman,* and *Chalupa,* this Court spoke to the modification issue in an appeal from a judgment granting joint custody. In *Squires v. Squires,* [51] we primarily addressed the appropriate use of joint custody, but also spoke to the problem of uncooperative joint custodians. In so doing, we indicated approval of *Chalupa's* statement that "[j]oint custody can be modified if a party is acting in bad faith or is uncooperative[,]" [52] and added that "[i]t should not be overlooked that to achieve such cooperation, the trial court may assist the parties by means of its contempt power and its power to modify custody in the event of a bad faith refusal of cooperation." [53] Notably, however, we rejected *Benassi's* description of an award

**45.** *Id.*

**46.** Since its original enactment in 1972, except for an amendment in 1998 to add the one sentence regarding de facto custodians, KRS 403.350 has read as follows:

A party seeking a temporary custody order or modification of a custody decree shall submit together with his moving papers an affidavit setting forth facts supporting the requested order or modification and shall give notice, together with a copy of his affidavit, to other parties to the proceeding, who may file opposing affidavits. If a court determines that a child is in the custody of a de facto custodian, the court shall make the de facto custodian a party to the proceeding. The court shall deny the motion unless it finds that adequate cause for hearing the motion is established by the affidavits, in which case it shall set a date for hearing on an order to show cause why the requested order or modification should not be granted.

**47.** *Benassi v. Havens, supra* note 43 at 869.

**48.** Ky.App., 780 S.W.2d 635 (1989).

**49.** *Supra* note 8.

**50.** *Id.* at 393.

**51.** *Supra* note 15.

**52.** *Id.* at 769 (quoting *Chalupa, supra* note 8 at 393).

**53.** *Id.* at 769.

of joint custody as "no award at all" by declaring that "joint custody must be accorded the same dignity as sole custody." [54] We therefore recognized that an award of joint custody is indeed a custody award just the same as an award of sole custody because both are custody awards under the same statute—KRS 403.270.

Then, the year after *Squires*, the Court of Appeals once again addressed the modification issue. In *Mennemeyer v. Mennemeyer*,[55] the husband sought to modify joint custody because the wife, whom the parties had designated to have physical custody of the parties' child, intended to relocate with the child to another state for employment purposes. The trial court modified custody, but instead of awarding the husband sole custody as he requested, continued the joint custody arrangement, but modified it by transferring physical custody of the child from the wife to the husband. On appeal, however, the Court of Appeals, citing both *Chalupa* and *Squires*, reasoned that "the trial court may intervene to modify a previous joint custody award only if the court first finds that there has been an inability or bad faith refusal of one or both parties to cooperate." [56] And, because the husband failed even to allege an "inability or bad faith refusal of the parties to cooperate," the

*Mennemeyer* Court held, "that the trial court erred by modifying its joint custody award by changing the physical custody of the child from [wife] to [husband]." [57] Thus, with *Mennemeyer*, it appeared that the appellate courts had finally settled on the modification standard for a joint custody arrangement, i.e., first, a threshold finding of an inability or bad faith refusal of one or both parties to cooperate,[58] and then, and only then, evaluation of the need for modification in accordance with the best interest of the children upon consideration of the factors that are enumerated in KRS 403.270.[59]

The issue's settlement appeared short lived, however. The following year, in *Aton v. Aton*,[60] the Court of Appeals, relying on *Benassi* and *Erdman*, ignored the threshold standard for modification only recently established by *Chalupa*, *Squires* and *Mennemeyer* and held that "any time the joint custodians come before the trial court, calling the joint custody arrangement into question, the court should review the custody status as if no custody determination had been made, in accordance with the best interests of the child." [61] But, then, in several cases rendered after *Aton*, e.g., *Stinnett v. Stinnett*,[62] *Jacobs v. Edelstein*,[63] *Briggs v.*

54. *Id.* at 770.

55. *Supra* note 6.

56. *Id.* at 558.

57. *Id.* at 558.

58. "[C]ooperation" [means] "willingness to rationally participate in decisions affecting the upbringing of the child." *Id.* at 769; *Squires v. Squires, supra* note 15; *Briggs v. Clemons*, Ky.App., 3 S.W.3d 760 (1999).

59. *Mennemeyer v. Mennemeyer, supra* note 6 at 558.

60. *Supra* note 8.

61. *Id.* at 615.

62. Ky.App., 915 S.W.2d 323 (1996).

63. Ky.App., 959 S.W.2d 781(1998) (although the Court ruled that the *Mennemeyer* threshold did not have to be met in order to address all issues that may arise in the framework of joint custody, the Court still adhered to the *Mennemeyer* threshold requirement before allowing modification of the basic award of joint custody and the physical possession of the child).

*Clemons,*[64] and *Stroud v. Stroud,*[65] the Court of Appeals returned to *Mennemeyer's* requirement of a threshold showing as a precondition to modification.

However, after six years of faithful adherence to *Mennemeyer,* the Court of Appeals, sitting en banc in *Scheer v. Zeigler,*[66] "conclude[d] that the approach of *Benassi* to joint custody was flawed and that it led to the improper threshold requirement of *Mennemeyer.*"[67] In support of its conclusion, the Court appropriately recognized *Squires's* holding that joint custody is a form of custody:

> When the *Benassi* court held that joint custody is not an award of custody at all, that KRS 403.340 and KRS 403.350 do not apply to joint custody modifications, and that joint custody modification motions should be heard de novo in accordance with KRS 403.270, it ignored the reality that joint custody is, in fact, a form of custody. Not only has joint custody been awarded by courts as a form of custody for a number of years, but it has also been recognized and authorized by the General Assembly as a form of custody since 1980.... [T]he Kentucky Supreme Court's decision in *Squires* ... recognized that "so long as KRS 403.270(4) remains the law of Kentucky, joint custody must be accorded the same dignity as sole custody and

trial courts must determine which form would serve the best interest of the child." Therefore, we conclude that *Benassi* was wrong in not recognizing joint custody as a form of custody.[68]

Accordingly, the *Scheer* Court explicitly overruled *Benassi* and *Mennemeyer* and held that the standard utilized in connection with modifications in the sole custody context is equally applicable to modification of awards of joint custody:

> Rather than continue the flawed premise of *Benassi* and the subsequent efforts of *Mennemeyer* and its progeny to correct it, we overrule *Benassi* and *Mennemeyer.* We hold that joint custody is an award of custody which is subject to the custody modification statutes set forth in KRS 403.340 and KRS 403.350 and that there is no threshold requirement for modifying joint custody other than such requirements as may be imposed by the statutes.[69]

■ Because, in *Squires,* this Court recognized that joint custody is on par with sole custody, we agree with *Scheer's* holding that joint custody is itself a custody award and thus any modification must come within the purview of KRS 403.340 and .350. When the General Assembly amended KRS 403.270 to authorize joint custody, the statutes that governed the modification of custody were already on

---

64. *Supra* note 58 (Although reaffirming the *Mennemeyer* threshold standard, the Court held, however, that "if a party to joint custody can prove that the child's present environment in the custody of the other parent endangers his physical, mental, or emotional health, that is sufficient to likewise modify joint custody, even if the evidence establishes that the parties have been cooperating in good faith with one another.") This adoption of the KRS 403.340 standard for joint custody cases—a standard that the Court had held in *Benassi* only applied to sole custody modification—was necessary, the Court stated, "to fill the gap in the law as it applies to those

situations where the parents in a joint custody arrangement are cooperating with each other, but the child is nevertheless endangered by his present environment with one of the parents." *Id.* at 762.

65. *Supra* note 35.

66. *Supra* note 6.

67. *Id.* at 811.

68. *Id.*

69. *Id.* at 814.

the books, and, because the General Assembly took no steps to enact additional statutes governing modification of joint custody awards, the legislature must have intended those prior provisions to apply equally to joint custody. In addition, we would also observe that the 2001 General Assembly amended KRS 403.340 to expressly encompass joint custody modifications,[70] and this subsequent enactment further supports the conclusion that joint custody modification is to be governed by the custody modification statutes.[71]

To summarize, joint custody modification falls exclusively within the purview of KRS 403.340 and .350, and the previous judicially-created "gateways" to joint custody modification are inapplicable. Thus, joint custody is not subject to modification at the mere whim of a party or simply because the parties disagree as to a child-rearing decision. Nor is the lack of cooperation by one or both parties grounds for modification of joint custody unless it rises to the statutory level required for modification of custody under KRS 403.340.

## D. RELOCATION BY PRIMARY RESIDENTIAL CUSTODIAN

Although, [n]ationally, "relocation of a custodial parent is a difficult and divisive issue[,]"[72] the relocation issue, at least in the context of sole custody, has been addressed and settled in Kentucky for more than a decade. In *Wilson v. Messinger*,[73] the mother was awarded sole custody of the parties' child and the father was granted visitation. Because both of the child's parents resided in the Raceland, Kentucky

area, the child continued to maintain close contact with both parents. Later, however, the mother proposed a move to West Virginia with the child, and both the child and her father objected to the proposed relocation. The father asked the trial court to modify its prior decree by designating him as the child's custodian, and he produced evidence of a certified social worker's assertions that the child suffered signs of stress attributable to the pending relocation of her custodial parent. At that time, KRS 403.340(2) read as follows:

If a court of this state has jurisdiction pursuant to the Uniform Child Custody Jurisdiction Act, the court shall not modify a prior custody decree unless it finds, upon the basis of facts that have arisen since the prior decree or that were unknown to the court at the time of entry of the prior decree, that a change has occurred in circumstances of the child or his custodian, and that the modification is necessary to serve the best interests of the child. In applying these standards, the court shall retain the custodian appointed pursuant to the prior decree unless:

(a) The custodian agrees to the modification;

(b) The child has been integrated into the family of the petitioner with the consent of the custodian;

(c) The child's present environment endangers seriously his physical, mental, moral, or emotional health, and the harm likely to be caused by a change

---

**70.** 2001 Ky. Acts ch 161, § 2, codified at KRS 403.340(1) ("As used in this section, "custody" means sole or joint custody, whether ordered by a court or agreed to by the parties.").

**71.** *See Kotila v. Commonwealth*, Ky., 114 S.W.3d 226 (2003) (subsequent enactment

clarified legislative intent as to prior enactment).

**72.** Graham & Keller, *supra* note 3 at § 21.24.

**73.** *Supra* note 5.

of environment is outweighed by its advantages to him.[74]

The trial court denied the father's modification motion after finding that the case did not come within the ambit of either subsections (a) or (b), and that the father failed to meet the burden of proof required by subsection (c). The Court of Appeals upheld the trial court's ruling, and, on discretionary review, we affirmed the decision of the Court of Appeals. We observed that the Court of Appeals had cited *Quisenberry v. Quisenberry* [75] for the principle that KRS 403.340(2) "intend[ed] to inhibit further litigation initiated simply because the noncustodial parent, or the child, or both, believe that a change in custody would be in the child's best interest." [76] We also referenced, approvingly, the Court of Appeals's statement that, "a custodial parent cannot, in today's mobile society, be forced to remain in one location in order to retain custody." [77] Like the trial court, we held that the father had failed to meet the burden imposed on him under KRS 403.340(2)(c) "for he has not proven the likelihood of harm to the child if custody is not modified," [78] and we held

that "the record fails to establish that the child's present environment endangers seriously [the child's] physical, mental, or emotional health." [79]

In relocation cases decided prior to the enactment of KRS 403.340, custodial mothers were allowed to relocate with the parties' child or children (1) because of their remarriage to men who worked outside of Kentucky,[80] or (2) they "offer[ed] some plausible reason." [81] Remarriage itself was viewed as a "compelling" reason to relocate to the new husband's residence.[82] These earlier cases placed the burden on the relocating custodial parent to justify the move. However, after *Wilson* and the enactment of KRS 403.340, a custodial parent's decision to relocate with the children is presumptively permissible, and a custodial parent may relocate with the children without prior approval or modification of the joint custody award:

> … [A] custodial parent—whether joint or sole—is not required to seek court approval prior to moving to another location. If one party opposes the move, then the issue becomes whether the joint custody decree can be modi-

74. KRS 403.340(2) (as originally enacted, 1972 Ky. Acts ch. 182, § 24).

75. Ky., 785 S.W.2d 485 (1990).

76. *Id.* at 487.

77. *Wilson v. Messinger, supra* note 5 at 204.

78. *Id.* at 204.

79. *Id.*

80. *Eversole v. Eversole,* Ky., 474 S.W.2d 685 (1971) (custodial mother moved to Guam where her new husband was stationed); *Alcorn v. Alcorn,* Ky., 388 S.W.2d 578 (1965) (custodial mother's two-year trip to Okinawa with her new husband did not amount to a change of condition justifying modification of

custody); *Byers v. Byers,* Ky., 370 S.W.2d 193 (1963) (custodial mother planned to take children to South Africa where she was to remarry); *Bowman v. Bowman,* 313 Ky. 806, 233 S.W.2d 1020(1950) (remarriage of custodial mother and move to Ohio insufficient to change custody).

81. *Brumleve v. Brumleve,* Ky., 416 S.W.2d 345, 346 (1967) (the court stating, "[m]ere whim is not enough.").

82. *Id.* at 346 ("When a divorced mother remarries, it becomes necessary that she assume the residence of her husband, and the court is left with only the alternative of permitting the removal of the children to the new husband's residence or denying the mother custody. Here Appellee can show no such force compelling her to leave the jurisdiction.").

fied.[83]

Although the relocation will, as a practical matter, impact a non-primary residential custodian's ability to share physical custody of the children, the relocation does not extinguish the non-primary residential custodial parent's *rights* with regard to shared physical custody, nor would the relocation affect the essential nature of the joint custody—i.e., the parents' shared decision-making authority. Thus, a non-primary residential custodian parent who objects to the relocation can only prevent the relocation by being named the sole or primary residential custodian, and to accomplish this re-designation would require a modification of the prior custody award. He or she must therefore show that "[t]he child's present environment endangers seriously his physical, mental, moral, or emotional health, *and* the harm likely to be caused by a change of environment is outweighed by its advantages[.]"[84]

Admittedly, *Wilson* addressed relocation only in the context of sole custody. However, the Court of Appeals's en banc decision in *Scheer* addressed relocation in the context of joint custody. Although *Wilson* was not cited, the *Scheer* Court—like the *Wilson* Court—held that a request to modify custody because of a proposed relocation by the parent designated by the trial court as the "primary caretaker" came within the purview of the general custody modification statute, KRS 403.340, and therefore, the objecting party was required to meet the more difficult standard thereunder. We agree.

■ To sum up, when a primary residential custodian gives notice of his or her intent to relocate with the parties' child,

the burden is then upon any party objecting to file a custody modification motion within a reasonable time and after that, to satisfy the modification standard of KRS 403.340 in order to change the designation of primary residential custodian. If no motion is filed within a reasonable time, the primary residential custodian may relocate with the parties' child.

### E. APPLICATION TO PRESENT CASES

#### 1. *FENWICK v. FENWICK*

■ During the time period relevant to this case, KRS 403.340 provided, in pertinent part:

(2) If a court of this state has jurisdiction pursuant to the Uniform Child Custody Jurisdiction Act, the court shall not modify a prior custody decree unless it finds, upon the basis of facts that have arisen since the prior decree or that were unknown to the court at the time of entry of the prior decree, that a change has occurred in circumstances of the child or his custodian, and that the modification is necessary to serve the best interests of the child. In applying these standards, the court shall retain the custodian appointed pursuant to the prior decree unless:

(a) The custodian agrees to the modification;

(b) The child has been integrated into the family of the petitioner with the consent of the custodian; or

(c) The child's present environment endangers seriously his physical,

---

**83.** *Stroud v. Stroud, supra* note 35 at 581.

**84.** KRS 403.340(2) (as originally enacted, 1972 Ky. Acts ch. 182, § 24) (emphasis added). *See also* CR 43.01("(1) The party holding the affirmative of an issue must produce the

evidence to prove it. (2) The burden of proof in the whole action lies on the party who would be defeated if no evidence were given on either side.").

mental, moral or emotional health, and the harm likely to be caused by a change of environment is outweighed by its advantages to him.

(3) In determining whether a child's present environment may endanger seriously his physical, mental, moral, or emotional health, the court shall consider all relevant factors, including but not limited to:

(a) The interaction and interrelationship of the child with his parent or parents, his siblings, and any other person who may significantly affect the child's best interests;

(b) The mental and physical health of all individuals involved;

(c) Repeated or substantial failure, without good cause as specified in KRS 403.240, of either parent to observe visitation, child support, or other provisions of the decree which affect the child, except that modification of custody orders shall not be made solely on the basis of failure to comply with visitation or child support provisions, or on the basis of which parent is more likely to allow visitation or pay child support;

(d) If domestic violence and abuse, as defined by KRS 403.720, is found by the court to exist, the extent to which the domestic violence abuse has affected the child and the child's relationship to both parents.[85]

Phillip Fenwick objected to Susan Fenwick's motion to relocate on the ground that relocation does not serve the children's best interests, and the trial court denied her motion for that reason. This rationale, however, fails to address the standard necessary for a custody modification. The proposed relocation itself does not implicate the grounds set forth in KRS 403.340(2)(a) & (b), and thus, Phillip Fenwick was required to meet the burden imposed under KRS 403.340(2)(c) as it then existed.[86] Accordingly, Phillip was

---

**85.** 1992 Ky. Acts, ch. 414 § 3. KRS 403.340 was not amended again until 1998. *See infra* note 93.

**86.** KRS 403.340 was amended by the 2001 General Assembly and now reads, in pertinent part, as follows:

(3) If a court of this state has jurisdiction pursuant to the Uniform Child Custody Jurisdiction Act, the court shall not modify a prior custody decree unless after hearing it finds, upon the basis of facts that have arisen since the prior decree or that were unknown to the court at the time of entry of the prior decree, that a change has occurred in the circumstances of the child or his custodian, and that the modification is necessary to serve the best interests of the child. When determining if a change has occurred and whether a modification of custody is in the best interests of the child, the court shall consider the following:

(a) Whether the custodian agrees to the modification;

(b) Whether the child has been integrated into the family of the petitioner with consent of the custodian;

(c) The factors set forth in KRS 403.270(2) to determine the best interests of the child;

(d) Whether the child's present environment endangers seriously his physical, mental, moral, or emotional health;

(e) Whether the harm likely to be caused by a change of environment is outweighed by its advantages to him; and

(f) Whether the custodian has placed the child with a de facto custodian.

(4) In determining whether a child's present environment may endanger seriously his physical, mental, moral, or emotional health, the court shall consider all relevant factors, including, but not limited to:

(a) The interaction and interrelationship of the child with his parent or parents, his de facto custodian, his siblings, and any other person who may significantly affect the child's best interests;

(b) The mental and physical health of all individuals involved;

required to show not only that "[t]he child[ren's] present environment [*i.e.*, the proposed relocation] endangers seriously [their] physical, mental, moral or emotional health, but also that the harm likely to be caused by a change of environment [*i.e.*, change of custody to Phillip Fenwick] is outweighed by its advantages to [them.]"[87] Phillip Fenwick failed to meet this burden.

We will not attempt to set forth the evidence in detail because we find it sufficient to state that Phillip Fenwick's stated and primary reason for objecting to Susan Fenwick's proposed relocation was that the present time-sharing schedule, which would be altered to some extent by the proposed relocation, allows the children to see him and other people with whom the children are close on a regular basis.[88] Although the "interaction and interrelationship" of the children with their father and other persons where they now live is a relevant factor in determining the likelihood of harm by the proposed relocation,[89] the mere fact that relocation may affect the frequency of Phillip Fenwick's time-sharing with his children and the children's contact with other persons does not, standing alone, support a finding that the proposed relocation creates a likelihood of serious harm to the children.[90] Any move by a custodial parent, even one of only a short distance in the same community, has the potential to impact the noncustodial parent's personal time with his or her children. To hold that this inherent effect of relocation constitutes grounds for modification, however, would result in a blanket denial of relocation whenever the noncustodial parent objected to a proposed move. We recognize that tradeoffs are inevitable, and further observe that if Susan Fenwick were forced to relinquish her primary residential custodian designation in order to move closer to her employment, her time with the children would necessarily likewise be reduced.

We realize that relocation often causes a hardship or inconvenience on the noncustodial parent's ability to exercise time-sharing with his or her child, but that

---

(c) Repeated or substantial failure, without good cause as specified in KRS 403.240, of either parent to observe visitation, child support, or other provisions of the decree which affect the child, except that modification of custody orders shall not be made solely on the basis of failure to comply with visitation or child support provisions, or on the basis of which parent is more likely to allow visitation or pay child support;

(d) If domestic violence and abuse, as defined in KRS 403.720, is found by the court to exist, the extent to which the domestic violence and abuse has affected the child and the child's relationship to both parents.

2001 Ky. Acts, ch. 161 § 2. Although the 2001 amendment appears to change the modification standard, that is not an issue in the present cases.

**87.** *Wilson v. Messinger, supra* note 5 at 203. *See also Quisenberry, supra* note 75; Graham & Keller, *supra* note 3 at § 21.24.

**88.** Additionally, Phillip Fenwick asserted that Jefferson County is a crime-ridden, traffic-jammed and pollution-filled area, unsafe for raising young children. As expected, no evidence was introduced at trial to support this claim.

**89.** KRS 403.340(3)(a).

**90.** *Alcorn v. Alcorn, supra* note 80 at 580 ("The fact that visitation is made more difficult for one of the parents does not amount to a change of condition under our cases."); *Bowman v. Bowman, supra* note 80 at 1022 ("As to the hardship or inconvenience on the father in exercising his right of visitation with his child living with her mother in Ohio, that question is answered in *Duncan v. Duncan,* 293 Ky. [762], 170 S.W.2d 22, 154 A.L.R. 549, where we said that the court must look to the welfare of the child in awarding custody and not to the inconvenience worked on the father in visiting his child.").

fact, in itself, does not constitute a valid reason to prohibit relocation. Modern American society is increasingly mobile,[91] and therefore, as the *Wilson* Court stated, "a custodial parent cannot, in today's mobile society, be forced to remain in one location in order to retain custody."[92] We agree with this observation in *Wilson* and would add that the realities of today's mobile society should also militate against de facto limitations—such as tying the primary residential custodian designation to willingness to remain in a particular location—on *primary residential custodians'* ability to relocate.

Finally, we observe that Susan Fenwick presented valid reasons for moving to Jefferson County. Her proposed relocation is not motivated by mere whim or for the purpose of denying Phillip Fenwick time-sharing or curtailing his participation in child-rearing decisions. As we previously noted, the essence of joint custody is shared decision-making, and there is no reason that Phillip Fenwick cannot still be an active participant in child-rearing decisions affecting his children. And even though the frequency of his personal contact with his children will necessarily diminish, the joint custody itself will remain unaffected by Susan's relocation because he will still be able to continue sharing substantial time with his children through personal contact and other means, *e.g.,* telephone calls, e-mails, and letters.

Phillip Fenwick failed to show emotional harm to the children beyond the general adjustment normally associated with a move. Clearly, he did not prove that the relocation would seriously endanger them. Accordingly, we hold that the change in the children's circumstances occasioned by Susan Fenwick's relocation does not rise to the level required under the statute for a change of custody, and the trial court thus erred by denying Susan Fenwick's request for relocation approval. We therefore affirm the Court of Appeals's decision reversing the trial court's denial of Susan Fenwick's relocation motion.

## 2. *HUCK v. HUCK*

KRS 403.340 was amended in 1998 to incorporate provisions relating to de facto custodians,[93] but the amendment

---

**91.** For an excellent discussion that illustrates our increased mobility by statistical analysis, see Janet M. Bowermaster, *Sympathizing with Solomon: Choosing Between Parents in a Mobile Society,* 31 U. of Louisville J. of Fam. L. 791, 795–96 (1992) (indicating, *inter alia,* that within four years nearly 75% of custodial mothers relocate); *See also* William G. Austin, *Relocation Law and The Threshold of Harm: Integrating Legal and Behavioral Perspectives,* 34 Fam. L.Q. 63, 65 (Spring 2000). The author notes:

> The strong pattern in family law is to generally allow the residential parent to move away with the child so long as satisfactory alternative parenting time arrangements with the nonresidential parent can be achieved and there are no bad faith motives for the geographical move. The basis for this new development of 'permissive' relocation law in favor of the residential parent

is a prioritizing of the 'new family unit' constituted by the post-divorce relationship between the primary care-taker parent and child. It is assumed that the child's welfare and healthy development are dependent on continuity in this relationship. (citations omitted).

**92.** *Wilson v. Messinger, supra* note 5 at 204.

**93.** " '[D]e facto custodian' means a person who has been shown by clear and convincing evidence to have been the primary caregiver for, and financial supporter of, a child who has resided with the person for a period of six (6) months or more if the child is under three (3) years of age and for a period of one (1) year or more if the child is three (3) years of age or older or has been placed by the Department for Community Based Services." KRS 403.270(1)(a).

did not otherwise change the statute,[94] and did not affect the disposition of this case because the pertinent parts of KRS 403.340 set out above remained the same during the time period relevant to this case.

The trial court prohibited Jennifer Huck from relocating with the children to Tennessee and held her in contempt because it found that her stated reasons for moving were not plausible, that the relocation would disrupt the present situation, and that she was not compelled to relocate by reasons beyond her control:

> The Court finds that the reasons advanced by [Jennifer Huck] for the establishment of new residence and relocation to the state of Tennessee were solely [her] elective desire with all factors being within her control and that the reasons advanced were not those that would be accepted as being plausible or such a set of circumstances that she was compelled for reasons beyond her control to relocate.
>
> . . . .
>
> The Court finds that the relocation to the state of Tennessee disrupts the previously established joint custody and the frequency of contact with the parents. . . . The disruption in the educational process is obvious concerning established recognition and familiarity with schools and the extended school supporting network of friends, classmates, and teachers has been disrupted.
>
> . . . .
>
> The Court will find based upon all the evidence presented that [Jennifer Huck] has not advanced sufficient compelling and necessary reasons for the relocation to the state of Tennessee and according-

ly, in that there is no agreement by [Benjamin Huck] nor a Court Order in place allowing her to do so that she is in contempt of Court.

As we have decided today,[95] these findings are not germane to the inquiry in which a trial court must engage when addressing an objection to a primary residential custodian's intention to relocate with the parties' children. In order to prevent the relocation of his children, Benjamin Huck—not Jennifer Huck—had to demonstrate that a change in the joint custody decree was warranted by showing not only that "[t]he child[ren's] present environment endangers seriously [their] physical, mental, moral or emotional health, [but also that] the harm likely to be caused by a change of environment is outweighed by its advantages to [them][.]"[96] His evidence falls far short of meeting this burden.

Benjamin Huck's basis for objecting to Jennifer Huck's relocation was two-fold: one, the move would "effectively cut-off meaningful parent-children relations between my children and [him]," and two, the trial court's judgment prohibited removal of the children from Kentucky absent an agreement of the parties or approval by the trial court. Neither of these objections is valid. First, although the children's relationship with their father is a relevant factor in determining the likelihood of harm by a proposed relocation,[97] for reasons explained in more depth above in Part III(E)(1), a reduction in the frequency of the non-custodial parent's time-sharing with the children, standing alone, did not permit a modification of custody under KRS 403.340. Granted, Benjamin Huck's time-sharing with the children will

94. 1998 Ky. Acts, ch. 250 § 3.

95. *See* Part III(D), *supra*.

96. *Wilson v. Messinger, supra* note 5 at 203.

97. KRS 403.340(3)(a).

be altered simply due to the distance between him and the children after the proposed relocation.[98] But, this does not mean that he cannot still participate in major child-rearing decisions with Jennifer Huck via telephone or other means. Although the frequency of his personal contact with the children will necessarily be reduced, the length of periods when the children are with him may even be increased—as Jennifer Huck has suggested. Admittedly, Benjamin Huck understandably would prefer personal contact over telephone communication with his children; nevertheless, telephone communications will allow him to maintain frequent contact with them.

For the children, the best of all possible worlds would have been for their parents to remain married, but that was not possible. The next best scenario would have been for their parents to continue to reside close to each other so that the children could maintain frequent personal contact with each parent and other persons close to the children, but again, that was also not workable. Now, the parties must make the best of a situation that is becoming more and more common to divorcing couples in our highly mobile society.

Even though an alleged "lack of plausible reasons" is not germane to the KRS 403.340 inquiry, we would add that the record does not support a finding that Jennifer Huck's reasons for relocating to Tennessee lacked merit. Her request to relocate was not motivated by mere whim or for the purpose of denying Benjamin Huck time-sharing or of curtailing his participation in child-rearing decisions. She wanted to be closer to her parents with their attendant support, to enroll in classes to improve her prospects for better employment, to improve her financial situation[99] by living in a home purchased by her parents, and to enroll the children in a Seventh Day Adventist school in Collegedale. As we have noted throughout this opinion, shared decision-making is the essence of joint custody, and as we have pointed out, there is no reason that Benjamin Huck cannot remain an active participant in child-rearing decisions affecting his children. Accordingly, we hold that the change in the children's circumstances does not rise to the level required under the statute.

The trial court's order included a provision that prohibited Jennifer Huck from relocating with the parties' children absent an agreement of the parties or the trial court's approval. This constraint was inappropriate because it not only placed the burden on Jennifer Huck to seek leave for the proposed relocation contrary to KRS 403.340(2)(c), which places the burden on Benjamin Huck to take action to prohibit the relocation if he objects, but also required her to justify the proposed relocation despite KRS 403.340's requirement that Benjamin Huck must show that the relocation to Collegedale "endangers seriously [the children's] physical, mental, moral, or emotional health, and the harm likely to be caused by a change of [custody to him] is outweighed by its advantages to [them]."[100] Although we recognize that a trial court may require a primary residential custodian to give timely notice of his or her intention to relocate with the children, we hold that the trial court exceeded its

---

98. Testimony in the record indicates that it is a five (5) hour drive between Oldham County and Collegedale.

99. Apparently, Benjamin Huck has not always been timely with child support and at times, an arrearage has occurred in child support.

100. KRS 403.340(2)(c).

authority by prospectively ruling out the possibility of Jennifer's relocation.

With the exception of general adjustment problems normally associated with a move, Benjamin Huck failed to prove the likelihood of any harm to the children from the move to Tennessee, and, in any event, failed to prove a likelihood of serious endangerment. Therefore, we reverse the Court of Appeals's decision affirming the trial court's denial of Jennifer Huck's relocation motion and holding her in contempt. We remand to the trial court with directions to enter an order allowing her to relocate to Collegedale with the children.

## IV. CONCLUSION

For the foregoing reasons, we affirm the Court of Appeals in *Fenwick v. Fenwick* and, in *Huck v. Huck,* we reverse the Court of Appeals and remand the case to the Oldham Circuit Court for entry of an order permitting Jennifer Huck to relocate with her children.

All concur.