RENDERED: OCTOBER 31, 2025; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2024-CA-1463-ME

L.P.                                                               APPELLANT

v.                   APPEAL FROM PULASKI CIRCUIT COURT
HONORABLE MARCUS L. VANOVER, JUDGE
ACTION NO. 23-J-00252-001

CABINET FOR HEALTH AND
FAMILY SERVICES,
COMMONWEALTH OF KENTUCKY;
E.L.P., JR.; AND E.P. (A CHILD)                            APPELLEES

OPINION
AFFIRMING

** ** ** ** **

BEFORE: CALDWELL, CETRULO, AND ECKERLE, JUDGES.

CALDWELL, JUDGE: Appellant, L.P., challenges the decisions, including the award of permanent custody, of the Pulaski Family Court in a Dependency case regarding E.P. (hereafter, the "Child"). We affirm the Pulaski Family Court.

## BACKGROUND

L.P. ("Mother") is the biological mother of Child, an infant who was born in February of 2023. Child was born in Louisiana, where Mother lived before moving to Kentucky. In October of 2023, the Cabinet for Health and Family Services ("Cabinet") filed an AOC-DNA-1 Petition which claimed dependency and sought emergency custody of Child. Attached to the Petition was an Emergency Custody Order Affidavit sworn to by Social Service Clinician Whitney Maurath, SSCH.

Mother is deaf and the Petition advised that interpretation services would be required for her. Mother was said to communicate by utilization of interpretation services that she accessed through her cell phone. The Affidavit indicated that Mother had been under the supervision of the Department for Community Based Services ("DCBS") and suffered from untreated mental health issues. Mother had failed to follow through with recommended mental health services and had indicated she no longer wished to comply with the supervision and safety plan established by DCBS. Furthermore, the Affidavit alleged that L.E., a family friend who served as Mother and Child's supervisor, had reported to DCBS that she no longer agreed to provide supervision or to allow Mother to continue to reside in her home after Mother had recently become aggressive toward her. No other appropriate fictive kin or family members were available to

provide supervision. The Petition stated that the biological father of Child, E.L.P., Jr. ("Father") was incarcerated in New Orleans at the time the pleading was filed.

The Affidavit further reported that Child had possible heart conditions which required appointments with specialists and that Mother had cancelled a scheduled appointment with Child's heart doctor. Additionally, the Petition cited to a recent incident which had led to Mother's admission to Lake Cumberland Psych Unit. There, Mother had been found by passersby who saw Mother wandering down Highway 635 in Pulaski County with Child in the middle of the night. The passersby reported they had contacted emergency services after they had witnessed Mother lie down on the side of the road after having urinated on herself. Emergency Medical Services ("EMS") providers who responded to the call documented Mother reporting that she had been hearing voices and had been able to see her two previously deceased infants. Following this admission to the psych unit, the Affidavit reported, Mother had not had any follow-up mental health treatment.

An Order was entered on October 25, 2023, which found that Child was in immediate danger and granted emergency custody to the Cabinet. A Temporary Removal Hearing occurred on October 27, 2023. In an order entered on October 30, 2023, the family court found that, although Mother had begun getting treatment, Child remained at risk of harm due to Mother's mental health

issues, citing to Mother having Child with her at the time of the incident that resulted in her admission to the psych unit.  It was ordered that Child be placed in temporary custody of the Cabinet with the family court adopting the Cabinet's recommendation of placement with L.B. if she were willing to accept.  The order found that reasonable efforts to prevent Child's removal had been made.

Following a conference on November 13, 2023, an order was entered which granted temporary custody of Child to L.B. and her husband E.B., following the Cabinet's recommendation.  An Adjudication Hearing occurred on January 22, 2024.  There, while represented by counsel, Mother stipulated to Dependency.  An Adjudication Order entered by the family court cited to Mother's stipulation and found Dependency had been proven by a preponderance of the evidence.  Child was ordered to remain with the temporary custodians.  The family court again found that reasonable efforts to prevent Child's removal had occurred. Additionally, in response to a motion by Child's Guardian *Ad Litem*, the court held that visits by Mother could occur remotely but that any in-person visits could be supervised by the Cabinet.  The order required that no contact between Mother and L.B. occur outside of visitations.

A Disposition Hearing occurred on March 4, 2024.  Following the hearing, the family court ordered that Child remain out of the home and with the temporary custodians.  As part of the Disposition Order, the family court ordered a

forensic mental health examination, parental competency, and risk assessment of Mother, to be completed by Dr. Paul A. Ebben. The order found that reasonable efforts to prevent removal had been made.

At a follow-up hearing on April 29, 2024, the family court adopted the recommendations of the Cabinet that Mother obtain and maintain stable housing and continue mental health services. It was noted that the Cabinet would attempt to set up a supervised visit near Mother's Day. It was additionally found that reasonable efforts to establish permanency for Child had been made.

Dr. Ebben's investigation and examination of Mother occurred in July of 2024. His findings were detailed in a ten-page document titled "Forensic Mental Health Examination: Parental Competency and Risk Assessment" ("Assessment") dated July 22, 2024. Dr. Ebben's Assessment asserted that, based upon his evaluation, unsupervised time between Mother and Child was not recommended. The Assessment recommended that guardianship/conservatorship examination be considered for Mother, expressing "significant concerns about [Mother's] capacity to take care of her own personal needs and finances." Citing to her previously being under a guardianship, the Assessment opined that Mother "appears quite vulnerable and uninsightful." *Id*. Furthermore, the Assessment recommended that the family court consider Termination of Parental Rights.

Additionally, Dr. Ebben's Assessment reported that Child had been diagnosed with complex febrile seizures as well as developmental delay and should be considered to have a special needs status. The Assessment advised that appropriate treatment for Child would require intensive speech, occupational, and physical therapy. Prospects for Mother to appropriately respond to Child's needs were unlikely, according to Dr. Ebben. The Assessment indicated that risk for future child maltreatment was high and would remain so for the foreseeable future.

According to Dr. Ebben's evaluation, reunification of Child and Mother and her request for unsupervised visitation were both unsupported. His Assessment found Mother's capacity to parent to be poor:

> [Mother] does not have the capacity to provide minimally acceptable care at this time, nor is there any reasonable path for reunification at this point given the significance of her limitations, lack of insight and awareness of her limitations, her defensiveness and guardedness, in combination with the presence of mental health problems and a recent substance abuse issue. There are indications she lacks the judgment, decision-making, and reasoning skills to make appropriate decisions for a young child.

Aside from concluding that Child was at direct risk of harm as a result of Mother's reasoning and decision-making capacity, the Assessment also concluded that Mother's history and circumstances presented "protective capacity concerns as well[.]" In support, the Assessment cited to Mother's extensive

reported history with paramours who had subjected her to domestic violence, including quite recent incidents. The Assessment concluded that Mother lacked:

> capacity to take care of her own needs, not to mention a young child's needs. She has a documented mental health history of significance that is accompanied by erratic behavior and poor decision making, and a reported history of having a guardian/conservator.

In response, Mother filed a "Motion for Second Opinion Forensic Mental Health Examination, Parental Competency, and Risk Assessment and for Unsupervised Time Share" in August of 2024. Therein, she argued that Dr. Ebben's Assessment did not consider evidence of contrary findings by other professionals which established her mental capacity was greater than acknowledged by Dr. Ebben. In support, she alleged that "[i]n Louisiana she was evaluated for a guardian and the mental health provider found that she was capable of taking care of herself and no guardian was needed." *Id*. She attached a Judgment from Orleans Parish Juvenile Court in Louisiana which returned Child to her custody in May of 2023. Mother's motion also attached a report detailing a psychiatric examination she underwent from October of 2014 and subsequent order lifting a guardianship. Additionally, Mother alleged that she "[did] not believe the Cabinet has made a genuine effort to reunify her with her son." She alleged that "with the proper services and assistance in place" she would be qualified to have

unsupervised visitation and for Child to live with her.  She further alleged that she "[felt] she had been discriminated against and treated unfairly because she is deaf."

In the Cabinet's Dependency Dispositional Report, filed in February of 2024, the recommended permanency goal had been Reunification.  However, following the Assessment, the Cabinet amended its recommendations.  The revised recommendations were memorialized in a Report to the Court filed on September 10, 2024.  Therein, the Cabinet recommended permanent placement of Child with the temporary custodians and that the case be stricken from the docket.  Dr. Ebben's Assessment was attached to the Cabinet's Report to the Court and his recommendations detailed.

The Cabinet filed another Report to the Court on November 7, 2024. Therein, it was reported that Mother had obtained independent housing, had been attending mental health services, and had enrolled in parenting classes.  The Cabinet conceded that Mother had been making progress.  However, it was also reported that the Mother's ability "to maintain progress" as well as her protective capacity were "very concerning."  The Cabinet reported that, within the past six months, Mother had obtained four emergency protective orders ("EPOs") against four different men.  It was alleged that Mother had previously proposed that two of these men serve as supervisor for her visits with Child to her social services worker.  The Report indicated that DCBS had provided referrals for treatment to

Mother, had informed her of all court dates, and had continued to ensure she had visits with Child.

The family court held a hearing on the permanent placement recommendation, as well as the Mother's motion, on November 12, 2024. DCBS employee Amy Marcum testified on behalf of the Cabinet. Marcum acknowledged that Mother had recently shown significant improvement in her commitment to the case plan and confirmed that Mother had secured stable housing as well as recently starting a part-time job. Marcum agreed that Mother had consistently attended recent parenting classes as well as appointments for her mental health treatment. However, Marcum testified that the Cabinet nonetheless recommended that permanent custody be granted with the placement. Marcum testified the modification to the Cabinet's recommendation had been based partly on the Assessment of Dr. Ebben that Mother would remain unable to parent Child alone, especially given Child's special needs.

Marcum indicated the modification to the Cabinet recommendation was additionally based upon concerns about Mother's protective capacity and a recurrent pattern of Mother proving unable to maintain long-term stability. Marcum expressed her opinion that Mother had demonstrated consistent poor judgment of character which led to Marcum's concerns regarding her protective capacity. She testified about her own awareness of recent legal proceedings in

Kentucky involving Mother, including several emergency protective orders filed against multiple men whom Mother had been involved with. She described an instance where Mother had sent her information about a man for whom Mother asked to be approved as her supervisor. She later learned that Mother had then filed an EPO against the same man the following week. Marcum testified that the Cabinet had made a referral to Adult Protective Services ("APS") for Mother after receiving Dr. Ebben's recommendation that a guardianship be considered for Mother.

Mother testified and was questioned regarding her history of homelessness and lack of a stable residence for much of the time she lived in Kentucky. She conceded she had been arrested for Criminal Trespassing Third Degree and Disorderly Conduct Second Degree in May of 2024. She acknowledged domestic violence with Father. Mother further acknowledged being aware that Father was a registered sex offender when she was involved with him. She acknowledged having filed recent EPOs but denied that one of them had in fact been as a result of domestic violence. She acknowledged one instance of requesting a man serve as her supervisor to her social services worker and subsequently filing an EPO against him.

An AOC-DNA-9 Order ("the AOC Order"), as well as a supplemental opinion and order ("the Order") which granted permanent custody in favor of

Child's temporary custodians was entered on November 14, 2024. In the Order, the family court denied Mother's motions for a second expert opinion and for unsupervised visitation. This appeal follows.

**ANALYSIS**

**Appellant's Deficient Brief**

Before addressing Mother's arguments, "[w]e regret having to address, yet again, an attorney's failure to comply with rules of appellate procedure." *French v. French*, 581 S.W.3d 45, 47 (Ky. App. 2019). However, there are several major deficiencies in Mother's opening brief that we are unable to overlook.

There is a glaring absence of sufficient citations to the trial court record that is immediately noticeable in the Appellant brief. RAP[1] 32(A)(3) and (4) require the statement of the case and arguments sections of an appellant's opening brief to contain "ample references to the specific location in the record" where "each" issue of law or factual statement may be located. Although "ample" is nowhere defined in RAP 32, we have previously determined it to indicate that citations to the trial court record must "permeate" the brief. *Clark v. Workman*, 604 S.W.3d 616, 619 (Ky. App. 2020).

---

[1] Kentucky Rules of Appellate Procedure.

While the statement of the case section of Mother's opening brief is a little over two pages in length, it contains only two specific citations to the video record and no citations whatsoever to the written record. The specific citations to the video record reference two different points in the testimony of "the DCBS employee" about a minute apart. In addition to these two pinpoint citations to the video record, Mother repeatedly cites to "*Id.*" on a half-dozen occasions during the statement of the case section, albeit while describing completely different questions and responses during Marcum's testimony than those initially referenced during the two pinpoint citations provided.

The lack of citations to the record is even more egregious in the argument section of Mother's brief. There, a near-total absence of citations to the record is observable. There is a solitary citation to the video record in this section while, again, not a single citation to the written record is made. This absence carries over to Mother's reply brief, which lacks a single citation to either the written record or the video record of the hearing. Repeatedly and throughout her briefs, Mother references material in the record, including prior orders of the family court, as well as reports tendered by both parties. However, she provides no citation as to the location in the record of any of these documents.

RAP 32(E)(1)(b) gave Mother the option to include in these documents in her brief's Appendix as "papers or exhibits in the appellate record to

which ready reference may be considered by the appellant as helpful to the appellate court." Mother did not avail herself of this option, which might have prompted her to ascertain the location in the record of the documents she references. This aside, Mother's brief is in violation of the requirements for her attached appendix pursuant to the appellate rules. Mother *did* attach the opinion and order under appeal—the Order and the AOC Order—to her initial brief as required by RAP 32(E)(1)(a). However, the same rule also dictates that "[t]he first item of the appendix *shall* be a listing or index of all documents included in the appendix." *Id*. (emphasis added). No such listing or index is present in Mother's brief. This requirement is reiterated in RAP 32(E)(1)(d), which further dictates that "[t]he index *shall* set forth where each document may be found in the record" and that "[t]he items in the appendix *shall* be separated by appropriate extruding tabs." *Id*. (emphasis added). The attached copies of both the Order and the AOC Order appear to be copied directly from the record on appeal; nowhere does the clerk's pagination appear on either. No citations to where the documents attached to Mother's brief are to be found elsewhere; neither is there any separation of the attached documents.

The failure to include an appropriate appendix is not insignificant. Compliance with this rule allows us to avoid rummaging through the record to ascertain the basis for the trial court's challenged decision. We are without the

-13-

time or resources to scour a record and search for items that a party references but has failed to meet its duty to locate in the record.

RAP 32(A)(4) decrees that the argument section of an appellant's opening brief "shall contain at the beginning of the argument a statement with reference to the record showing whether the issue was properly preserved for review and, if so, in what manner." Neither of Mother's two main arguments in her initial brief satisfy this straightforward requirement; nothing resembling an explicit preservation statement appears in either. The same rule requires the "argument conforming to the statement of points and authorities" to contain "citations of authority pertinent to each issue of law[.]" *Id.* Mother's statement of points and authorities cites to two cases and one statute. Aside from being sparse, Mother's contention as to how these citations are pertinent to the issues of law invoked in her specific arguments is not apparent in her brief, as further detailed below.

We decline to overlook the glaring deficiencies herein. It is plain that Mother has failed to "substantially comply with the rules[.]" RAP 10(B).

> Rule-offending appellate counsel necessarily weaken their clients' chances of victory on appeal. They do not intend to hide injustices, but their filing of a deficient brief increases the possibility of such an effect. Judges and their law clerks – public servants all – believe themselves duty-bound to triage deficient briefs to decide which might be accomplishing that unintended consequence. That places an unnecessary load on an

-14-

already over-burdened system. *See Commonwealth v. Roth*, 567 S.W.3d 591, 594-95 (Ky. 2019) (internal quotation marks and citation omitted) ("Without pinpoint citations to the record, a court must sift through a record to [find] the basis for a claim for relief. Expeditious relief would cease to exist without this requirement."). When counsel fail to narrow focus to specific parts of a record, or when they point to little or no persuasive legal authority, they unnecessarily tax already limited judicial resources.

*J.P.T. v. Cabinet for Health & Fam. Servs.*, 689 S.W.3d 149, 152 (Ky. App. 2024).

While we leniently decline to strike the brief, given the total lack of any preservation statement we shall review the issues raised by Mother only for manifest injustice. *See J.P.T.*, 689 S.W.3d at 153 (citing *Ford v. Commonwealth*, 628 S.W.3d 147, 155 (Ky. 2021)) ("[An] argument failing to inform appellate court how issue was preserved and where to find it in record can be treated as unpreserved."); CR[2] 61.02 ("A palpable error which affects the substantial rights of a party may be considered by the court on motion for a new trial or by an appellate court on appeal, even though insufficiently raised or preserved for review, and appropriate relief may be granted upon a determination that manifest injustice has resulted from the error.").

---

[2] Kentucky Rules of Civil Procedure.

-15-

# STANDARD OF REVIEW

Where a claim of error is properly preserved, our standard of review of a custody determination in a DNA[3] action "is limited to whether the factual findings of the lower court are clearly erroneous." *L.D. v. J.H.*, 350 S.W.3d 828, 829 (Ky. App. 2011) (citing CR 52.01). As to a family court's legal conclusions, they are reviewed *de novo*. *Id.* at 830 (citing *Brewick v. Brewick*, 121 S.W.3d 524, 526 (Ky. App. 2003)). Furthermore,

> [a] finding of fact is clearly erroneous if it is not supported by substantial evidence, which is evidence sufficient to induce conviction in the mind of a reasonable person. If the family court's findings of fact were supported by substantial evidence, and it applied the correct law, its decision will not be disturbed absent an abuse of discretion. An abuse of discretion occurs when the family court's decision is unreasonable or unfair. Thus, in reviewing the decision of the family court, the test is not whether the appellate court would have decided it differently, but whether the findings of the family court are clearly erroneous, whether it applied the correct law, or whether it abused its discretion.

*M.C. v. Cabinet for Health and Fam. Servs.*, 614 S.W.3d 915, 921 (Ky. 2021) (internal quotation marks and citations omitted).

Here, as a result of the sanction we impose, we review for manifest justice, or palpable error. An error is palpable if it is "so egregious that it jumps off the page . . . and cries out for relief[,]" *Chavies v. Commonwealth*, 374 S.W.3d

---

[3] Dependency, neglect, or abuse.

313, 323 (Ky. 2012) (internal quotation marks and citation omitted), and is so elemental as to be "easily perceptible, plain, obvious and . . . so serious that it would seriously affect the fairness to a party if left uncorrected." *Hibdon v. Hibdon*, 247 S.W.3d 915, 918 (Ky. App. 2007) (internal quotation marks and citations omitted).

**The Family Court's Determination that Permanent Custody was in Child's Best Interest was Not Manifest Injustice**.

In Mother's first argument, she alleges the family court's determination that permanent placement with E.B. and L.B. was in Child's best interest was clearly erroneous as the factual findings of the family court were unsupported by substantial evidence. As supportive authority for the general assertion that substantial evidence is that sufficient to induce conviction in the mind of a reasonable person, Mother cites to *B.C. v. B.T.*, 182 S.W.3d 213, 219 (Ky. App. 2005).

However, as Mother lays out her argument in her brief more specifically, she provides no more citations to authority. Mother argues that, because no party formally entered Dr. Ebben's Assessment into evidence during the hearing, the family court erred by referencing and relying upon the opinions of Dr. Ebben in the Order granting permanent placement. She alleges that she was not provided with any notice that the family court might rely on the Assessment and she was, accordingly, denied any opportunity to object to the Assessment as

hearsay. Furthermore, her brief argues, the family court referenced other information that "was not presented at the hearing."[4] She alleges, without citation to authority, that the family court "should not be permitted to use extrinsic evidence for its ruling[.]" If all such extrinsic evidence is disregarded, Mother argues, no factual finding of the family court was supported by substantial evidence.

With no citation to authority for the central contentions in her argument, we have no obligation to research or argue any such issues about the Order or hearing for Mother. "It is not our function as an appellate court to research and construct a party's legal arguments[.]" *Hadley v. Citizen Deposit Bank*, 186 S.W.3d 754, 759 (Ky. App. 2005).

Mother's argument is focused primarily upon the family court's references to and reliance upon the Assessment of Dr. Ebben. Mother complains that the Assessment featured prominently in the Order and that the Cabinet cited to it as a reason for the recommendation of permanent custody with the placement. Although conceding that arguments and testimony from the Cabinet at the hearing did reference Dr. Ebben's Assessment (to which Mother made no

---

[4] Mother does not provide a specific description of this information she objects to but seems to take issue with the family court noting that, in the Louisiana case plan documents that Mother herself submitted as an Exhibit at the hearing, Child had been returned to her care "with the understanding [that] she was going to be living with or near [E.B. and L.B.] to assist her." Order, p. 5.

-18-

contemporaneous objection), Mother argues consideration of the Assessment was erroneous because it "was not admitted into evidence and the Cabinet worker didn't recall what it said." Mother argues that, had it *been* offered into evidence at the hearing, counsel would have objected to it as hearsay. No formal objection was made, Mother insists, because she received no notice of the potential utilization of the Assessment by the family court, Mother insists she was denied any opportunity to object or cross-examine the author of the Assessment.

Although unmentioned in her argument, multiple matters were before the family court during the subject hearing. This included Mother's own "Motion for Second Opinion Forensic Mental Health Examination, Parental Competency, and Risk Assessment and for Unsupervised Time Share." Mother's motion criticized Dr. Ebben's Assessment and asked the family court to order an additional assessment of her for a second opinion to consider. This tends to undercut Mother's assertion that she was blindsided that the family court would utilize Dr. Ebben's Assessment in rendering its decision regarding custody. Moreover, a significant portion of the references to the Assessment within the Order, beginning with its opening page, are made while discussing Mother's motions.

Additionally, the family court found that the Assessment had been "provided to all parties but no one elected to call Dr. Ebben for cross-

examination." Although Mother argues she was denied the opportunity to cross-examine Dr. Ebben, she makes no allegation of error regarding this specific finding, nor does she allege she was prohibited from calling Dr. Ebben as a witness for cross-examination during the hearing.

KRS[5] 620.027 allows a family court to determine custody in DNA cases "where the need for a permanent placement and custody order is established as set forth in this chapter." In so doing, the family court is to "utilize the provisions of KRS Chapter 403 relating to child custody and visitation." *Id.* In the AOC Order here, the family court appropriately found the temporary custodians, as non-parents, had standing to pursue permanent custody by establishing *de facto* custodianship of child, in accordance with the requirements of KRS 403.270(1)(a). Mother raises no dispute as to this finding.

Once a family court has determined a party has established their status of *de facto* custodian, that party is due the same standing in custody matters as a natural parent and the family court's determination of custody is made in accordance with the best interests of the child. *Baker v. Combs*, 248 S.W.3d 581, 584 (Ky. App. 2008) (citing KRS 403.270(1)(b) and KRS 403.270(2)).

---

[5] Kentucky Revised Statutes.

Another provision of KRS Chapter 403 related to child custody and visitation, appropriately utilized by a family court exercising jurisdiction under KRS 620.027, is significant here. KRS 403.290(2) permits a family court to:

> seek the advice of professional personnel, whether or not employed by the court on a regular basis. The advice given shall be in writing and made available by the court to counsel upon request. Counsel may examine as a witness any professional personnel consulted by the court.

This Court has previously stated that when a family court elects, pursuant to KRS 403.290(2), "to order psychological tests of the . . . parents, in order to assist in making the custody determination . . . the professional's conclusions are merely expert testimony, or evidence to be considered by the courts[.]" *Chalupa v. Chalupa*, 830 S.W.2d 391, 392 (Ky. App. 1992) (citations omitted), *abrogated on other grounds by Fenwick v. Fenwick*, 114 S.W.3d 767 (Ky. 2003), *overruled on other grounds by Pennington v. Marcum*, 266 S.W.3d 759 (Ky. 2008). The statute then authorizes a "custody-determining court to *sua sponte* request custodial investigations and other advice[.]" *Van Gansbeke v. Van Gansbeke*, 700 S.W.3d 263, 268 (Ky. App. 2024) (quoting *Morgan v. Getter*, 441 S.W.3d 94, 112 (Ky. 2014) (citations omitted)). Where this results in an evidentiary report the parties are not without due process rights, including that of cross-examination of the author. *Id.*

While Mother does invoke her right to confrontation by arguing she was effectively denied the right to cross-examination, there is no indication counsel lacked the opportunity to cross-examine Dr. Ebben as a witness regarding the Assessment, either prior to the hearing or during it. The Assessment itself includes contact information for the scheduling of depositions of Dr. Ebben, as well for the service of subpoenas for testimony. The record indicates that the Assessment was received by counsel several months before the hearing. Furthermore, Mother had also received the report of DCBS which also recommended permanent placement with E.B. and L.B. and cited extensively to Dr. Ebben's Assessment.

Where there is a dispute as to custody before it, FCRPP[6] 6(2)(b) authorizes a family court to "order . . . [p]sychological evaluation(s) of a parent[.]" Furthermore, in this DNA case, KRS 620.023 also applies. This statute, titled "Evidence to be considered in determining the best interest of a child," *requires* a family court rendering a decision as to the best interest of a child to consider relevant evidence of several specific circumstances. These include "[m]ental illness as defined in KRS 202A.011 or an intellectual disability as defined in KRS 202B.010 of the parent, as attested to by a qualified mental health professional, which renders the parent unable to care for the immediate and ongoing needs of the

---

[6] Kentucky Family Court Rules of Procedure and Practice.

child[.]" KRS 620.023(1)(a). Another specific circumstance is relevant evidence of "[s]ubstance use disorder, as defined in KRS 222.005, that results in an incapacity by the parent or caretaker to provide essential care and protection for the child[.]" KRS 620.023(1)(c).

Dr. Ebben's Assessment contains relevant evidence regarding both of these factors. Furthermore, KRS 620.023(1)(f) requires the family court to consider "[t]he existence of any guardianship or conservatorship of the parent pursuant to a determination of disability or partial disability as made under KRS 387.500 to 387.770 and 387.990." Here, the Assessment discussed a previous guardianship of Mother, albeit in another state, as well as Dr. Ebben's opinion that a subsequent guardianship of Mother might be advisable. Accordingly, while KRS 620.023(1)(f) may not have *required* the family court to consider this particular evidence from the Assessment, considering a family court's general discretion in custody determinations, as well as under KRS 403.290(2), we cannot say it was manifest injustice for the family court to consider it.

**The Reasonable Efforts to Reunify**

Mother's second argument is that the Cabinet failed to utilize reasonable efforts at reunification.

The family court determined that reasonable efforts had been made prior to removal in the January 22, 2024, Adjudication Order. The same finding

appeared in the April 11, 2024, Disposition Order. Mother does not appear to take issue with the Cabinet's efforts prior to this, however. In the AOC-DNA-9 Order, there was included the conclusion of law that "[r]easonable efforts have been made to prevent removal of child from parental care or were not required by KRS 610.127."

Mother alleges that the Cabinet did not utilize all available services to reunify her with Child without specifying any available resources which were unused. However, in her Appellant brief, Mother fails to specify any such services which might accomplish this. She argues that the Cabinet must recognize that she "may have unique needs that require a little extra time and attention, and some research may be required for some unique services to reunify this family." Furthermore, in this argument Mother essentially concedes that she *does* lack the parental capacity for unsupervised visitation; she asserts that "with the right services in place" she "could be reunited with her son." Based upon our review of the record, Mother argued much the same to the family court. The Commonwealth argues that the Cabinet exhausted all reasonable efforts and the Mother failed to provide the family court, or this Court, with any concrete example of "reasonable efforts" at reunification that were not made.

In support of her argument that the Cabinet failed to make reasonable efforts at reunification, Mother alleges that "[t]he statute requires that the Cabinet

-24-

prove by clear and convincing evidence that there is no reasonable expectation of improvement." However, the only specific citation to any statute Mother makes is to KRS 620.020(13). There, "reasonable efforts" are defined as: "the exercise of ordinary diligence and care by the department to utilize all preventive and reunification services *available to the community* in accordance with the state plan for Public Law 96-272 which are necessary to enable the child to safely live at home[.]" *Id*. (emphasis added). With no allegation to the family court that the Cabinet failed to utilize services available to the community in their reunification efforts, we certainly cannot deem a conclusion that reasonable efforts were made an instance of palpable error.

The other citation to authority made by Mother in this argument is to the opinion of this Court in *K.D.H. v. Cabinet for Health & Family Services*, 630 S.W.3d 729, 738 (Ky. App. 2021). However, *K.D.H.* dealt with an appeal of an involuntary termination of parental rights. *Id*. Turning to the pinpoint citation Mother provides, the statute at issue in the discussion therein is KRS 625.090. Earlier in the same opinion, it is pointed out that KRS 625.090 "provides that the circuit court may involuntarily terminate all parental rights of a parent of a named child only upon findings based on 'clear and convincing evidence that the child has been adjudged to be an abused or neglected child, as defined in KRS 600.020(1), and that termination would be in the best interest of the child.'" *Id*. at 736 (quoting

*M.E.C. v. Commonwealth, Cabinet for Health and Family Services*, 254 S.W.3d 846, 854 (Ky. App. 2008)). The Order under appeal does not terminate Mother's parental rights. KRS 625.090 is not at issue in this case.

However, KRS 620.140(1)(c) does place an obligation on the family court that: "[b]efore any child is committed to the cabinet or placed out of his or her home under the supervision of the cabinet, the court shall determine that reasonable efforts have been made by the court or the cabinet to prevent or eliminate the need for removal and that continuation in the home would be contrary to the welfare of the child."

The orders here regarding permanent custody do not specify whether the family court concluded that "[r]easonable efforts have been made to prevent removal of child from parental care **or** were not required by KRS 610.027." (Emphasis added.) Reasonable efforts at reunification are not required if "court of competent jurisdiction" has determined a parent has "[m]ental illness as defined in KRS 202A.011 or is an individual with an intellectual disability as defined in KRS 202B.010 or other developmental disability as defined in KRS 387.510 that places the child at substantial risk of physical or emotional injury even if the most appropriate and available services were provided to the parent for twelve (12) months[.]" KRS 610.127(6). Although the orders here reference mental illness and intellectual disability in regard to Mother, no specific determination by the

family court or reference to another court's determination is apparent upon our review.

However, per KRS 610.127(8), reasonable efforts to reunification are also not required where there is a determination of "[o]ther circumstances in existence that make continuation or implementation of reasonable efforts to preserve or reunify the family inconsistent with the best interests of the child and with the permanency plan for the child."

Here, the Order noted the testimony of Marcum that the Cabinet recommendations for reunification had ceased after the receipt of Mother's evaluation which indicated she lacked the capacity to parent alone or for unsupervised visitation. An additional change in circumstances noted in the Order was the family court and parties being informed of the specific health and developmental conditions of Child which required elevated care and attention, as well as Mother's recent history of legal proceedings.

From our review of the record, Mother essentially conceded that she required additional services before she could parent alone or have unsupervised visitation. Additionally, the family court cited Marcum's testimony that, despite the recent demonstration of laudable efforts, she was of the opinion that Mother was unable to maintain the stability necessary for Child, and her consistent poor judgment of character in the men she kept company with demonstrated a lack of

protective capacity. Furthermore, she testified that Child's health and developmental needs demanded special care which Mother could not provide.

We are not unsympathetic to Mother's unfortunate circumstances, and we applaud her efforts at rehabilitation. However, we see no indication from our review of the record that compels a finding that the change in the Cabinet's recommendation from reunification to permanent placement was made in haste or without an evidentiary basis.

The record demonstrates protective services were necessary for Child as a newborn in another state before Mother first gained supervised custody. Child was less than nine months old when the DNA action was filed in October of 2023. Mother thereafter stipulated to Dependency. Following this, more than a year had passed when the hearing at issue occurred in November 2024. During much of that same period, by her own testimony, Mother's life had been dangerously turbulent. She admitted to repeatedly keeping company with multiple men who subjected her to violence. She confirmed requesting of DCBS that a man be named her case supervisor and, shortly thereafter, filing an EPO against the same individual.

In sum, there was substantial evidence to support the family court's finding that the Cabinet made reasonable efforts or that reasonable efforts were no longer required per KRS 610.127. Furthermore, we discern no palpable error in

the family court's conclusion that permanent placement was in Child's best interests.

To the extent that our reasoning differs from that stated by the family court, we may properly affirm for any reason supported by the record. *Mark D. Dean, P.S.C. v. Commonwealth Bank & Tr. Co.*, 434 S.W.3d 489, 496 (Ky. 2014). Other arguments in the parties' briefs which we do not discuss herein have been determined to lack merit or relevancy to our resolution of this appeal.

## CONCLUSION

For the foregoing reasons, we affirm the Pulaski Family Court's judgment.

ALL CONCUR.

| BRIEFS FOR APPELLANT: | BRIEF FOR APPELLEE: |
|---|---|
| Alison D. Hunley<br>Somerset, Kentucky | Christopher Lee Coffman<br>Somerset, Kentucky |